INTERNATIONAL TELEVISION PRODUCTIONS LTD. and Harold M. Cerra, Plaintiffs,

v.

TWENTIETH CENTURY–FOX TELEVISION DIVISION OF TWENTIETH CENTURY–FOX FILM CORPORATION, Jerry Harrison & Associates, Inc. and Jerry Harrison, Defendants.

No. 84 Civ. 8795 (GLG).

United States District Court, S.D. New York.

Dec. 5, 1985.

Jon M. Kaufman, New York City, for plaintiffs.

Bushkin, Gaims, Gaines, Jonas & Stream, New York City, for defendant Twentieth Century-Fox Television Div. of Twentieth Century-Fox Film Corp.; Jeffrey T. Strauss, of counsel.

## OPINION

GOETTEL, District Judge:

Although two defendants are named in this suit, only one, Twentieth Century-Fox Television Division of Twentieth Century-Fox Film Corporation ("Fox"), has been served. Four causes of action have been interposed thus far against Fox, with a fifth apparently forthcoming. Before the Court are Fox's motions to dismiss various aspects of the amended complaint that charge it with wrongdoing.

## I. Background

The amended complaint alleges the following facts which we deem true for the purpose of evaluating the motions to dismiss. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Plaintiff International Television Productions Ltd. ("ITP") is a Bermuda corporation with its principal place of business in London, England. On June 17, 1980, ITP entered into a joint venture with defendant Jerry Harrison & Associates ("Harrison"),[1] a New York corporation. The joint venture was to produce a series of television pro-

---

1. The amended complaint also names as a defendant Jerry Harrison, who allegedly so dominated and controlled Jerry Harrison & Associ- ates as to make it his alter ego. Hereinafter, we refer to Jerry Harrison and his company collectively as "Harrison."

grams entitled "The Roots of Rock 'N Roll."

On October 27, ITP and Harrison (collectively "the joint venture") finalized a written distribution agreement ("the distribution agreement") with defendant Fox. The joint venture promised to produce and deliver six one-hour television programs to Fox. In return, Fox, which received the exclusive right to distribute the programs, promised, *inter alia*, to distribute the programs world-wide and to account to the joint venture for the proceeds. Fox also agreed to pay $100,000 to the joint venture after the delivery of each show. Another plaintiff, Harold M. Cerra ("Cerra"), agreed to advance Harrison substantial sums to finance its share of the production costs. In exchange, Harrison agreed to repay Cerra from the revenues remitted by Fox. According to the amended complaint, Fox had actual or constructive knowledge of the joint venture agreement and of the Harrison-Cerra agreement.

ITP and Cerra allegedly met all of their obligations under the various agreements,[2] and Fox accepted delivery of six programs from the joint venture. The programs were originally broadcast in 1981 and subsequently licensed abroad and rebroadcast. Nevertheless, Fox, in purported violation of its agreement with the joint venture, refused to pay $300,000 of the $600,000 called for in the distribution agreement as an advance against ultimate royalties. Fox has also allegedly failed to account accurately for the proceeds and profits from the distribution of the program.

The amended complaint is a mass of legalisms, interspersed with facts that do little to inform the reader. As best we can interpret this conundrum, it appears to set forth four claims for relief. The first is that Fox was obligated to pay $600,000 to the joint venture (in $100,000 installments after the delivery of each program) yet only paid half of this amount. The second

claim is that ITP did not receive its share of $250,000 that Fox paid the joint venture. There are also two fraud claims. The plaintiffs allege that Fox misrepresented certain financial projections in a September 1981 letter to Harrison, as agent for the joint venture. The joint venture and plaintiff Cerra allegedly relied on the letter to their detriment. Fox allegedly perpetrated a second fraud when it delivered certain false accounting statements to ITP. These statements misstated the proceeds and profits from the program's distribution, thereby preventing ITP from obtaining its rightful share of the distribution revenue. The plaintiffs seek compensatory and punitive damages for these frauds.

The plaintiffs derive five causes of action from these four claims. The first claim, for breach of contract, is set forth in the first cause of action along with the claim of failure to account for proceeds under the distribution agreement. The plaintiffs seek $275,000 in damages for this claim, but we do not understand how this amount is arrived at. The second claim is set forth as the second cause of action, against Harrison only, seeking $275,000 in damages. (Again, we do not understand how the $275,000 damage demand for this cause of action was arrived at.) The two fraud claims are jointly set forth in the third cause of action. The plaintiffs seek $400,000 in compensatory damages jointly for the two frauds. They also demand punitive damages on these claims. Finally, the plaintiffs contend that the previously mentioned four claims together constitute a restraint of trade that violates the antitrust laws of the United States (the fourth cause of action) and of New York (the fifth cause of action).

The plaintiffs commenced this action in state court by serving Fox, which then removed the action to this Court pursuant to 28 U.S.C. § 1446 (1982).[3] Fox then

---

**2.** ITP admits that the joint venture failed to obtain some clearances of musical rights. Amended Complaint ¶ 17. However, it maintains that that failure is not material to the violations of law alleged in the amended complaint.

**3.** Neither the original complaint nor the amended complaint was served on defendant Harrison.

moved to dismiss; the plaintiffs amended their complaint in response; and Fox brought another motion to dismiss. Before the Court is Fox's second motion against the amended complaint, pursuant to Fed.R. Civ.P. 12(b)(6), to dismiss the first, fourth, and fifth claims and the punitive damage aspect of the third claim, for failure to state a claim on which relief can be granted. It also moves, pursuant to Fed.R. Civ.P. 12(e), for a more definite statement of the damages sought on the third claim.

## II. Discussion

### A. Motion to Dismiss the First Claim

Fox asserts that the rules of law applicable to joint ventures preclude both plaintiffs from maintaining their first cause of action. Paragraphs 20 and 21 of the amended complaint are the heart of that claim. These paragraphs respectively state, "Fox ... has failed and refused to advance to the Joint Venture not less than $300,000 of the $600,000 called for in the Production-Distribution Agreement," Amended Complaint ¶ 20, and "Fox ... has failed and continues to fail to account accurately for the proceeds and profits of the distribution of the Programs," Amended Complaint ¶ 21.[4] Fox correctly points out that these claims belong to the joint venture. Neither ITP nor Cerra may assert them individually, yet this is what they attempt.

■ The rules of law applicable to partnerships also govern joint ventures.[5] *D'Ippolito v. Cities Services Co.*, 374 F.2d

643, 647 (2d Cir.1967); 16 N.Y.Jur.2d § 1594 at 274 (1981). *Fallone v. Misericordia Hospital*, 23 A.D.2d 222, 226, 259 N.Y.S.2d 947 (1st Dep't 1965), *aff'd*, 17 N.Y.2d 648, 269 N.Y.S.2d 431, 216 N.E.2d 594 (1966). A partner who seeks to recover a debt due the partnership, must sue in the partnership's name or on its behalf. *Kirschbaum v. Merchants Bank*, 272 A.D. 336, 71 N.Y.S.2d 79 (1st Dep't 1946). A partner who seeks an accounting must do the same. *Stevens v. St. Joseph's Hospital*, 52 A.D.2d 722, 381 N.Y.S.2d 927 (4th Dep't 1976). The same rules apply to joint ventures.[6] These rules mandate the dismissal of the first claim, which seeks the precise relief—recovery of a joint venture's debt and an accounting on its behalf—that the courts have held to belong solely to the venture. ITP, a member of the venture, may not assert these claims in its individual capacity. Cerra, who is neither a member of the venture nor a party to an agreement with the venture, may not assert either claim. The claims of both plaintiffs in the first cause of action are, therefore, dismissed.

### B. Motions to Dismiss the Antitrust Claims

### 1. The Sherman Act Claim

The plaintiffs claim that the agreement between Fox and Harrison pursuant to which Harrison allegedly breached the joint venture agreement violates section 1 of the Sherman Antitrust Act, which makes il-

---

**4.** In discussing its first claim, ITP argues that Fox should not have remitted the joint venture's funds to Harrison and that Fox is liable for improperly favoring one co-venturer · over another. Plaintiffs' Memorandum in Opposition at 8–10. Those arguments do not bear on the viability of the first claim, which does not include the above-noted allegations.

**5.** According to Rule 17 of the Federal Rules of Civil Procedure, "the capacity of a partnership ... to sue or be sued is determined by the law of the state in which the district court is sitting." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1564 at 740 (1971). Since, under New York law, a partnership and a joint venture are treated identically, *see infra* p. 1536, the Court finds (in the absence of any evidence to

the contrary) that New York law controls the plaintiffs' capacity to bring this action.

**6.** Although a joint-venturer may sometimes sue a third person in its own behalf, *see, e.g., Steinberg v. Noyes*, 257 A.D. 866, 12 N.Y.S.2d 722 (2d Dep't 1939) (joint venturer may sue third-party who induced coventurer to commit fraud against plaintiff); 16 N.Y.Jur.2d § 1594 (1981) ("[t]hird parties may be required to account for any property they received or diverted with knowledge or notice that it belonged to a joint venture or with knowledge or notice concerning the interest of the particular parties in the transactions"), a venturer who simply seeks an accounting and recovery on the venture's behalf may not.

legal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations...." 15 U.S.C. § 1 (1982). Fox interposes a variety of objections to this claim. According to Fox, the plaintiffs have not properly alleged a contract, combination, or conspiracy; they do not have standing to assert their claims, and they have not alleged "antitrust injury." These arguments are misguided. The amended complaint's failure to allege a substantive violation of the antitrust laws, nevertheless, mandates the dismissal of the Sherman Act claim.

**a. Contract, Combination, or Conspiracy**

■ Absent an agreement between two or more independent business entities, there can be no violation of section 1. *World Arrow Tourism Enterprises, Ltd. v. Trans World Airlines, Inc.*, 582 F.Supp. 808, 810–11 (S.D.N.Y.1984). Neither a conclusory allegation of a conspiracy, *Lombard's, Inc. v. Prince Manufacturing, Inc.*, 753 F.2d 974, 975 (11th Cir.1985), nor an allegation of a unilateral business decision, *World Arrow Tourism Enterprises, Ltd., supra*, 582 F.Supp. at 810–11, will survive a motion to dismiss. The complaint must identify the co-conspirators, and describe the nature and effects of the alleged conspiracy. *General Electric Co. v. Bucyrus-Erie Co.*, 563 F.Supp. 970, 975 (S.D.N.Y.1983).

■ Fox contends that the amended complaint charges only unilateral activity. A careful reading of the amended complaint belies this assertion. Paragraph 24, incorporated by reference in the fourth and fifth claims, states, "Between October 27, 1980 and June 1981, on at least two separate occasions, in violation of the Production-Distribution Agreement, defendants agreed that defendant Fox would disburse and defendant Harrison & Associates would receive not less than $250,000 from the funds intended for the joint venturers." Amended Complaint ¶ 24. This paragraph identifies two parties to an agreement and specifies the content of that agreement.

The plaintiffs need not, as the defendant maintains, identify the consideration for the agreement. *See* Fed.R.Civ.P. 8. The pleadings suffice to withstand this branch of the motion to dismiss.

**b. Antitrust Standing and Antitrust Injury**

According to Fox, neither plaintiff has standing under the antitrust laws to bring its claim nor has either alleged the requisite "antitrust injury."

**1) Antitrust Standing**

■ The Supreme Court has termed the question of antitrust standing an inquiry into the conceptually difficult question of " 'which persons have sustained injuries *too remote* [from an antitrust violation] to give them standing to sue for damages....' " *Blue Shield v. McCready*, 457 U.S. 465, 476, 102 S.Ct. 2540, 2546, 73 L.Ed.2d 149 (1982) (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 n. 7, 97 S.Ct. 2061, 2065 n. 7, 52 L.Ed.2d 707 (1977)). The Court has identified several factors that should guide the standing inquiry. Factors weighing against a grant of standing include the speculative nature of the damage theory alleged, the risk of duplicative recoveries, and the danger of complex apportionment of damages. Those that counsel for a grant of standing are the directness of the asserted injury, the presence of an improper motive for the conduct alleged, and the manageability of the resulting litigation.[7] *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (*"Associated General Contractors"*); *see also Triple M. Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 247 (2d Cir.1985) (listing factors).

■ The defendant's objection to ITP's standing borders on the ludicrous. None of the factors weigh against granting standing to ITP; in fact, most weigh in its favor. ITP is the direct victim of the allegedly unlawful conspiracy. The potential for duplicative recoveries or complex apportionment of damages is nil, and the rela-

---

7. Whether a factor weighs for or against granting of standing depends on how it is stated.

tionship between the conduct alleged and the alleged injury is neither tenuous nor speculative.

Dicta from the Supreme Court's opinion in *Associated General Contractors* supports our conclusion that ITP has antitrust standing to assert its claims. The plaintiffs in that case, various unions and their local affiliates, claimed that the Associated General Contractors, an association of building and construction contractors, conspired with members and nonmembers of their association in an effort to coerce subcontractors to refrain from hiring members of the plaintiff unions. "According to the complaint, defendants applied coercion against certain landowners and other contracting parties in order to cause them to divert business from certain union contractors to nonunion contractors." *Associated General Contractors, supra,* 459 U.S. at 540, 103 S.Ct. at 910. After noting that any damages suffered by the Union as a result of this scheme were only an indirect result of the scheme, the Court stated, "If either [the contractors or subcontractors], or the immediate victims of coercion by defendants have been injured by an antitrust violation, their injuries would be direct and ... they would have [standing] ... to maintain their own treble damages actions against the defendants." *Id.* 103 S.Ct. at 911. Here, ITP, the alleged victim of an agreement by two parties to freeze it out of the market, is comparable to the contractors and subcontractors. The above-noted dicta thus supports our conclusion that ITP has standing to bring this action under the antitrust laws.

■ On the other hand, the Supreme Court's balancing test counsels us to deny standing to Cerra. Cerra is the indirect victim of any scheme to restrain competition and his damages will be difficult to calculate. Moreover, the relationship between Cerra's injury and the conduct alleged is speculative at best. Where the direct victim of an antitrust violation brings suit, Cerra, the indirect victim, may not bring suit on the same claim.

### 2) Antitrust Injury

Antitrust standing and antitrust injury involve separate though related inquiries. The inquiry relative to antitrust standing concerns the relationship between the plaintiff's injury and the alleged violation. Antitrust injury looks only to the nature of the alleged injury. In order to allege antitrust injury, a plaintiff must allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Brunswick v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "[A] claim of injury arising from the preservation of competition is a claim 'inimical to the purposes of [the antitrust] laws.'" *Blue Shield v. McCready, supra,* 457 U.S. at 483 n. 19, 102 S.Ct. at 2550 n. 19 (quoting *Brunswick v. Pueblo Bowl-O-Mat, Inc., supra,* 429 U.S. at 488, 97 S.Ct. at 697).

■ ITP alleges that one of its competitors, Harrison, conspired to damage its business. Although there are many forms of antitrust injury, *see Blue Shield v. McCready, supra,* 457 U.S. at 482–83, 102 S.Ct. at 2550, an injury suffered by one competitor by virtue of a conspiracy engaged in by another competitor is, if not prototypical, certainly the kind of injury about which the antitrust laws are concerned.[8] *Id.* at 484, 102 S.Ct. at 2551. For example, in *Blue Shield v. McCready,* the Court examined a scheme in which the plaintiff, a Blue Shield subscriber, alleged that Blue Shield had conspired with psychiatrists to deny reimbursement to psychologists. The Court stated, "the antitrust injury, [in the event that psychologists were successfully boycotted], would have been borne in the first instance by the competitors of the conspirators...." *Id.* at 483, 102 S.Ct. at 2550. In this case, the alleged antitrust injury was in the first instance borne by ITP.

---

**8.** Although Cerra's alleged injury is not a direct consequence of the alleged antitrust violation, it too occurred by virtue of conduct that the antitrust laws were assertedly intended to prevent.

### c) The Substantive Violation

Except in the narrow class of *per se* cases, a plaintiff alleging a violation of section 1 of the Sherman Act must show that the defendants acted to restrain competition. 1 E. Kintner, *Federal Antitrust Law* § 8.3 (1980). In order to make such a showing and thereby survive a motion to dismiss, a section 1 claimant must identify the relevant product market and "allege how the net economic effect of the alleged violation is to restrain trade in the relevant market, and that no reasonable alternate source is available" to consumers in that market. *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1355 (S.D.N.Y.1982). The only market to which the plaintiffs refer is the market for "the development, production, and distribution of television shows and series." Amended Complaint ¶ 37. This broad allegation will not suffice to delineate the relevant market in an antitrust complaint. The plaintiffs have not even attempted to explain this vague market definition. *See Gianna Enterprises, supra*, 551 F.Supp. at 1354. In addition, they have not specified the economic impact in the relevant market. Having failed to allege a restraint on competition, the plaintiffs only recourse is to allege a *per se* violation of the antitrust laws. If such a violation is alleged, the plaintiffs need not show a deleterious impact on competition. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) ("[B]ecause of their pernicious effect on competition and lack of any redeeming virtue, [these practices] are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."). The Court must therefore determine whether an agreement to breach a single contract—absent a refusal to buy or sell from the alleged target of the contract—constitutes a *per se* violation of the antitrust laws.

The only conceivable case authority that supports construing the conduct alleged herein as a *per se* violation of the antitrust laws is *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) ("*Klor's*"). In *Klor's*, the Supreme Court found a *per se* violation where the defendants, a chain of retail appliance stores and its various distributors and their manufacturers had banded together and agreed not to sell to the plaintiff, a small retail appliance store. According to *Klor's*, "individual refusals to deal, when supported by outside agreements with the victim's competitors, [will] not be tolerated." 2 E. Kintner, *Federal Antitrust Law* § 10.30 at 164 (1980). It matters not whether the agreement's effect on competition is *de mimimus, id.* at 164, or that it does not effectively exclude its victim from the market. *Associated General Contractors, supra*, 459 U.S. at 528, 103 S.Ct. at 903.

We do not believe *Klor's* proscribes the conduct herein, *i.e.*, it does not apply to an agreement by a purchaser to assist one supplier in breaching a contract with another supplier. This conduct is not so pernicious as to warrant a presumption of anticompetitiveness. Indeed, a common law action for breach of contract or tortious interference with business relations can redress this alleged wrong. Neither of the defendants has refused to deal with the plaintiffs; rather, they have allegedly combined to undermine a contract. Absent a showing that competition has been impaired, the Court will not allow the conversion of this breach of contract claim into a treble damage claim under the antitrust laws.

Because the amended complaint fails to state a claim under section 1 of the Sherman Act, the motion to dismiss the fourth claim is granted.

### B. The Donnelly Act Claim

The allegations that underlie the plaintiffs' claim under New York's antitrust statute, the Donnelly Act, N.Y.Gen. Bus.Law § 340 (McKinney 1968), are identical to those that support its Sherman Act claim. Not surprisingly, the defendant moves to dismiss this claim as well.

The Donnelly Act prohibits

[e]very contract, agreement, arrangement or combination whereby . . .

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby

For the purpose of ... unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained....

N.Y.Gen.Bus.Law § 340 (McKinney 1968). Most Donnelly Act claims are analyzed under a rule of reason analysis. 14 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* § 164.01[1] (1985). This analysis applies to group boycotts like the one alleged herein, *see supra* p. 1539. *Id.* at 164–11 (and cases cited therein). In order to survive a motion to dismiss a Donnelly Act claim that is susceptible to analysis under the rule of reason, a complaint must allege an anticompetitive effect in the market in which the plaintiff competes. *Saxe, Bacon & Bolan, P.C. v. Martindalle-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir.1983); *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976); *Dawn to Dusk, Ltd. v. Frank Brunckhorst Co.*, 23 A.D.2d 780, 781 (2d Dep't 1965).[9] Because the plaintiffs have failed to adequately delineate the market in which they operate or to indicate how competition in that market has been impaired, the amended complaint fails to state a claim under the Donnelly Act.[10]

■ Alternatively, the fifth claim must be dismissed for failure to allege the requisite economic impact in this state. Such failure constitutes sufficient grounds for dismissing a claim under the Donnelly Act. *Baker v. Walter Reade Theatres, Inc.*, 37 Misc.2d 172, 237 N.Y.S.2d 795, 796 (Sup.Ct. N.Y.County 1962) (dismissing Donnelly Act claim because alleged wrongful contract had impact outside New York).

ITP, a Bermuda corporation with its principal place of business in London, has not indicated how the scheme alleged herein affected New York commerce. If ITP's ability to compete in the markets for the production or development of TV programs was harmed, any impact occurred in London, not in New York, where, by its own admission, ITP does not do business. Defendant's Notice of Motion, Exhibit E. Any indirect economic impact in New York is purely speculative and outside of the scope of activity that the Donnelly Act addresses.[11]

## C. The Fraud Claim

The amended complaint demands $400,-000 in compensatory damages and $1,200,-

---

**9.** The plaintiffs direct our attention to *Schlottman Agency, Inc. v. Aetna Casualty and Surety Co.*, 70 A.D.2d 1041, 417 N.Y.S.2d 561 (4th Dep't 1979), and *Eagle Spring Water Co. v. Webb & Knapp, Inc.*, 236 N.Y.S.2d 266 (Sup.Ct.N.Y.County 1962). These decisions held that a complaint may survive a motion to dismiss for failure to state a claim under the Donnelly Act if it generally alleges "that the tendency of the alleged arrangement or combintation will be or has been to lessen competition in the relevant market." *Schlottman Agency, Inc., supra,* 417 N.Y. S.2d at 562. This statement runs counter to *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1976). In deciding a motion to dismiss for failure to state a claim, the Court of Appeals in that case examined the anti-competitive impact of the particular practice alleged. *State v. Mobil Oil Corp.* continues to state the law in New York. Moreover, even if the cases cited by the plaintiffs were applicable, they would not save the amended complaint, which does not satisfactori-

ly delineate the market in which competition was impaired.

**10.** The defendants reiterate their objections based on standing, antitrust injury, and failure to allege the requisite agreement. The standing and antitrust injury analyses under the Donnelly Act mirror those under the Sherman Act. Therefore, Fox's objections to ITP's standing and injury as they relate to the Donnelly Act claim. *See supra* pp. 1537–38. Since the lacks both prerequisites to a viable Donnelly Act claim. *See supra* pp. 1537–1538. Since the language in the Donnelly Act requiring a "contract, agreement, arrangement, or combination" is somewhat broader than the comparable Sherman Act language, *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 408 F.Supp. 1251, 1283 (S.D.N.Y.1976), the complaint *a fortiori* alleges sufficient concerted action under that statute.

**11.** That the distribution agreement was partly prepared in New York is unimportant. Al-

000 in punitive damages for the fraud claimed in the third cause of action. Fox objects to both demands. It moves for a more definite statement of the request for compensatory damages and to dismiss the claim for punitive damages.

Fox asserts that the $400,000 demand is ambiguous, forcing it to guess whether the demand includes the damages sought on the breach of contract claim. Fox contends that this ambiguous demand violates Fed. R.Civ.P. 10(b) which states, "Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth." Fed.R.Civ.P. 10(b). The Court does not understand the defendant's contention. Rule 10(b) regulates the substance of a claim, not the content of the *ad damnum* clause. The third claim complies with the letter of this rule. Indeed, by specifying their damages, the plaintiffs have exceeded the requirements of the Federal Rules of Civil Procedure. *Everco Industries, Inc. v. O.E.M. Products Co.,* 63 F.R.D. 662, 666 (N.D.Ill.1974) (while damages may not be determined by mere speculation or guess, it is sufficient to state the nature of the damages and allow the issue to be further developed by pretrial discovery). If Fox has any trouble understanding the *ad damnum* clause, it can sharpen its understanding through discovery.

We do note that the second claim of fraud, for false accounting of revenue and expenses, would seem to be the joint venture's claim, not the plaintiff's. However, defendant Fox has not moved against that aspect of the complaint. The nebulous na-

ture of the *ad damnum* is, in part, a consequence of that improper joinder of claims.

Fox also insists that the pleadings do not allege facts sufficient to state a claim for punitive damages. In order to state such a claim, a complaint alleging fraud must plead and prove "gross, wanton, or wilfull fraud or other morally culpable conduct. *Borkowski v. Borkowski,* 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976). A complaint that merely alleges fraud without alleging any other morally culpable or gross conduct will be dismissed. *Zaretsky v. E.F. Hutton & Co.,* 509 F.Supp. 68, 77 (S.D.N.Y.1981); *H & R Hats and Novelties, Inc. v. Citibank, N.A.,* 102 A.D.2d 742, 477 N.Y.S.2d 9 (1st Dep't 1983); *Janina Travel Bureau, Inc. v. Kalison,* 72 A.D.2d 916, 422 N.Y.S.2d 322, 323–24 (4th Dep't 1979). Viewed in a light most favorable to the plaintiffs, the amended complaint contains allegations of run-of-the-mill fraud involving the intentional misstatement of financial projections [12] and financial reports. The amended complaint does not allege gross or wanton conduct or criminal indifference to civil obligations. An award of punitive damages is inappropriate in these circumstances. That portion of Fox's motion that seeks to dismiss the punitive damage demand on the third claim is granted.

III.  Conclusion

Defendant Fox's motions to dismiss the first, fourth and fifth claims and to dismiss the punitive damage claim arising out of the third claim are granted. Fox's request for an order requiring the plaintiffs to replead their damage demand in the third claim is denied.[13]

SO ORDERED.

---

though this fact might bear on issues of personal jurisdiction or conflict of laws, it says nothing about the economic impact of the scheme.

**12.**  Predictions, as contrasted with misstatements of fact, afford a very shaky basis for asserting fraud.

**13.**  By letter dated July 29, 1985, the Court granted the plaintiffs' application to amend the com-

plaint to add a claim under the Racketeer Influenced and Corrupt Organization's Act, 18 U.S.C. §§ 1961–68 (1985). Although the Court does not issue advisory opinions, we cannot help noting that the facts heretofore alleged do not appear to establish a "pattern of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.,* — U.S. ——, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); *Northern Trust Bank/O'Hare, N.A. v. Inryco,* 615 F.Supp. 828 (N.D.Ill.1985); *Rojas v.*

*First Bank National Association,* 613 F.Supp. 968 n. 1 (E.D.N.Y.1985).