**Marcy ALTMAN, Individually And On Behalf Of All Others Similarly Situated, Plaintiff,**

v.

**BAYER CORPORATION, Barr Laboratories, Inc. and the Rugby Group, Inc., Defendants.**

**No. 00 Civ. 7743 (CM).**

United States District Court, S.D. New York.

Dec. 22, 2000.

David Bershad, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for Plaintiff.

Barbra S. Levy, Jones, Day, Reavis & Pogue, New York City, Karen N. Walker, Thomas D. Yannucci, Kirkland & Ellis,

Lamberg Heather Kafele, Sherman & Sterling, Washington, DC, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING MOTION TO REMAND TO STATE COURT

MCMAHON, District Judge.

Plaintiff Marcy Altman brings claims on behalf of herself and other New York state indirect purchasers of the patented antibiotic drug Ciprofloxacin ("Cipro") against defendants Bayer Corporation, Barr Laboratories, and The Rugby Group, Inc., for violations of state antitrust and deceptive trade practice statutes. She contends that Defendants violated New York General Business Law §§ 340, 349 by agreeing to pay Defendants Barr and Rugby $49 million, and to make additional payments of $24.5 million per year to Barr, in exchange for Barr's agreement to refrain from introducing and marketing a Cipro generic equivalent.

Plaintiff alleges that Barr and Bayer restrained trade in violation of section 340 of the New York General Business Law (the "Donnelly Act") by (1) restraining Barr and other generic manufacturers from marketing a generic equivalent of Cipro; (2) stabilizing the price of Cipro; (3) allocating the market for Cipro and its generic equivalent; and (4) transferring monopoly profits to Barr and Rugby. (Compl.¶ 2.) She also alleges that the agreement between the defendants amounted to a deceptive trade practice under section 349 of the New York General Business Law.

Defendants removed the case to federal court, asking this court to assert jurisdiction under 28 U.S.C. 1338(a). Defendant so moves on the ground that an essential element of plaintiff's state law antitrust claim requires resolution of a substantial question of patent law: namely, that in order to prove injury-in-fact, plaintiff must demonstrate that Bayer's patent for the compound ciprofloxacin is invalid.

For the reasons stated below, I conclude that this case should be remanded to state court.

## FACTS PERTINENT TO THE MOTION

On May 29, 1984, Bayer filed the last of a series of patent applications for Cipro, and subsequently obtained the Cipro patent on June 2, 1987.

On or about October 22, 1991, Barr filed for Abbreviated New Drug Approval ("ANDA") for a generic version of Cipro. In an ANDA filing, a company seeking to manufacture a generic equivalent must disclose its position vis-a-vis the original patent and certify that no patent for the generic equivalent has been filed with the FDA, and one of the following: (1) that the patent for the brand name drug has expired; (2) that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date; or (3) that the patent for the brand name drug is invalid or will not be infringed upon the proposed generic company's product. (Compl.¶ 28.) Barr certified that Bayer's patent was invalid.

On or about December 6, 1991, Barr notified Bayer of its ANDA filing for ciprofloxacin, and on or about January 16, 1992, Bayer brought a patent infringement suit against Barr. Under the Drug Price Competition and Patent Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984), commonly known as the Hatch–Waxman Amendments, if a patent owner responds with a patent infringement lawsuit after an ANDA filing, FDA approval is postponed for 30 months. (Compl.¶ 29) Hatch–Waxman also gives a 180–day period of market exclusivity to the first manufacturer successfully to file an ANDA. (Id.¶ 30) No other generic manufacturer filing an ANDA for that drug may market its product until the exclusivity period expires. The exclusivity period commences on the date when the generic manufacturer begins marketing the new drug or, if there is

a patent infringement claim against it, on the date when the generic manufacturer receives a patent infringement decision in its favor, whichever is earlier. If neither of these conditions occurs, the exclusivity period cannot expire and no other generic manufacturer may market its generic version of the affected drug.

Ten months after Bayer filed the patent infringement suit, on November 30, 1992, Bayer and Barr executed a stipulation ("the Stipulation") extending the 30-month waiting period until entry of a "final judgment" in the patent litigation. (Id.) Bayer and Barr further agreed that for purposes of the Stipulation, a "final judgment" would exist only after the conclusion of all appeals to the Court of Appeals for the Federal Circuit, or the expiration of the time permitted for such appeals. The patent court signed the Stipulation and Order on December 8, 1992.

On or about January 4, 1995, the FDA tentatively approved Barr's ANDA for a Cipro generic equivalent. At that time, the patent suit between Bayer and Barr had not gone to "final judgment." According to plaintiff, if Bayer and Barr had not entered into the Stipulation, Barr would have been legally entitled to market its Cipro generic equivalent at that time.

Defendants Bayer and Barr entered into another agreement on or about January 8, 1997 ("the Agreement") in which Barr agreed not to market its Cirpo generic equivalent in the United States or otherwise trigger the 180 day exclusivity period in exchange for Bayer's promise to pay $24.5 million each to Barr and Rugby. The Agreement also provided for a Contingent Non-Exclusive Supply Arrangement, effective as of January 1998, which ends when the patent expires in December of 2003. Under the Contingent Non-Exclusive Supply Arrangement, Bayer may: (i) supply ciprofloxacin to Barr to sell under a generic label, or (ii) pay Barr an annual amount based on Bayer's sales of Cipro for the next six years, which were estimated to be approximately $24 million a year. Plaintiffs allege that the defendants did not advise the patent court of the material terms of the Agreement. At the time the Agreement was executed, the parties entered a consent judgment in which defendant Barr acknowledged the validity and enforceability of Bayer's patent.

Plaintiff alleges that the effect of the Stipulation and the Agreement was to delay the approval to market Barr's generic version of Cipro, and at the same time, to avoid triggering the 180 day market exclusivity period. The result was to foreclose any Cipro generic equivalent competition from entering the market. (Id.)

## DISCUSSION

Federal courts may entertain any civil action which is based upon a claim or right arising under the Constitution, treaties or laws of the United States. 28 U.S.C. § 1331. Under 28 U.S.C § 1338(a), the "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents." A civil action brought in state court may be removed to federal court only if a federal court could have exercised original jurisdiction in the case. 28 U.S.C. § 1441(a).

■ The Supreme Court has established a two-part test to decide which cases "arise under" § 1338(a). According to the Supreme Court:

> [j]urisdiction extends only to those cases in which [1] a *well pleaded complaint* establishes either that federal patent law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a *substantial question of federal patent law*, in that patent law is a necessary element of one of the well pleaded claims.

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809, 108 S.Ct. 2166, 2169, 100 L.Ed.2d 811 (1988) (emphasis added).[1]

---

1. *Christianson* was litigated in the federal courts in Illinois because plaintiff asserted

### 1. *Well–Pleaded Complaint Rule*

Under the first part of the *Christianson* test, the "well-pleaded complaint" rule, "whether a claim 'arises under' patent law 'must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose.'" *Id.* (quoting *Taylor v. Anderson,* 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914)). Similarly, a case raising a federal defense does not "arise under" federal law pursuant to 28 U.S.C. § 1338, "even if the defense is anticipated in the complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.,* 463 U.S. 1, 14, 103 S.Ct. 2841, 2848, 77 L.Ed.2d 420 (1983).

Plaintiff Altman did not plead any federal claim on the face of her complaint. Rather, she asserts claims exclusively under the New York General Business Law. Therefore, any finding of such jurisdiction must be found in the second part of the *Christianson* test: that plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal patent law.

### 2. *Substantial Question of Federal Patent Law: Summary of Argument*

In order to evaluate fairly whether an element of one of plaintiff's state causes of action necessarily depends on a question of federal patent law, *Christianson* teaches us that "we are to look at the elements of the claims appearing on the face of the complaint." *Hunter Douglas,* 153 F.3d at 1328–29. Our scrutiny of the claims pleaded is thorough for "we must ascertain whether all the theories by which a plain-

tiff could prevail on a claim rely solely on resolving a substantial question of federal patent law." *Id.* If there is any way that plaintiff could prevail without resolving a substantial question of federal patent law, the complaint must be remanded.

Neither party in *Christianson* disputed that the patent law did not create petitioners' antitrust or intentional-interference claims. So the Court focused on whether patent law "is a necessary element of one of the well-pleaded [antitrust] claims." *Id.* (quoting *Merrell Dow Pharmaceuticals, Inc. v. Thompson,* 478 U.S. 804, 813, 106 S.Ct. 3229, 3234, 92 L.Ed.2d 650 (1986)). The Court understood the petitioner's claim to encompass both a monopolization claim under § 2 of the Sherman Act and a group-boycott claim under § 1, and concluded that the patent law issue, "while arguably necessary to at least one theory under each claim, is not necessary to the overall success of either claim." *Id.* at 810, 106 S.Ct. 3229.

The Court noted that in order to make out a § 2 claim, petitioners would have to present a theory under which the identified conduct amounted to a "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." The Court was willing to assume that the invalidity of Colt's patents was an essential element of the monopolization theory rather than merely an argument in anticipation of a defense. *See id.* at 811, 106 S.Ct. 3229. But the Court concluded that the well-pleaded complaint rule focuses on *claims, not theories,* saying: "[J]ust because an element that is essential to a particular theory might be governed by federal patent law does not mean that the entire monopolization claim 'arises under' patent law." *Id.* at 811, 106 S.Ct. 3229. Since there are "reasons completely unre-

claims under §§ 1 and 2 of the Sherman Act. The issue in *Christianson* was whether the appeal from a judgment in favor of Christianson and against Colt lay in the Seventh

Circuit or the Federal Circuit, which had exclusive jurisdiction to hear appeals "arising under" the patent law. 486 U.S. at 801, 108 S.Ct. 2166.

lated to the provisions and purposes of federal patent law why petitioners may or may not be entitled to the relief they seek under the monopolization claim, the claim does not arise under federal patent law." *Id.* (citations omitted).

In support of removal, defendant asserts that plaintiff's action "arises under" federal law because at least one of plaintiff's state law claims (its claim under the Donnelly Act) is dependant upon a determination of patent invalidity—an issue that lies within the exclusive jurisdiction of the federal courts. Defendants say plaintiff cannot recover under the Donnelly Act without demonstrating injury-in-fact, which itself requires a finding that Bayer's patent is invalid. Plaintiff responds that her claims are unaffected by the patent's validity because they are based solely on agreements made by defendants that were designed to restrain trade and improperly to delay generic manufacturers from entering the market.

Defendant argues that the rule of *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed.Cir.1998), is controlling here. In *Hunter Douglas,* the Federal Circuit held that it had "arising under" jurisdiction over a state law claim pleading an "injurious falsehood." Citing *Christianson,* the court first looked to the elements of the claims appearing on the face of the complaint, explaining that in order to prove the case, plaintiff must have made an allegation of a false statement. *See id.* Plaintiffs maintained that defendants falsely had asserted that they "hold exclusive rights to make or sell window shades covered by one or more of [defendant's patents]." *Id.* at 1329. The plaintiffs charged that the assertion was false because certain claims in the defendant's patents were invalid and all of the claims were unenforceable. *See id.*

The court concluded that this state law claim, as pleaded, arises under section 1338(a). The claim satisfied the well pleaded complaint rule, because the required element of the state cause of action—i.e. falsity—necessarily depended on a question of federal patent law. *See id.* That is, if the defendant's statement was false, it could only be because the patent was invalid. Moreover, in order to demonstrate falsity, all theories on which the plaintiff could prevail depended upon resolving a question of federal patent law, because no other basis for a falsity was pleaded by plaintiff. *See id.*

Defendant also relies on *Additive Controls & Measurement Systems, Inc. v. Flowdata,* 986 F.2d 476, 478 (Fed.Cir. 1993), to support removal jurisdiction. In *Additive Controls,* plaintiff Adcon alleged that defendant Flowdata had committed business disparagement. Under Texas law, a business disparagement claim requires plaintiff to prove, as part of its prima facie case, the falsity of defendant's allegedly disparaging statements. *See id.* at 478. Flowdata's allegedly disparaging statement was its accusation that Adcon had infringed Flowdata's patent. *See id.* To prove this aspect of the case (falsity), the court held that Adcon needed to show that the product did not infringe Flowdata's patent. *See id.* The court concluded that Adcon's "right to relief necessarily depends upon resolution of a substantial question of patent law, in that proof relating to patent infringement is a necessary element of Adcon's business disparagement claim." *Id.* at 478. Because Adcon's right to relief necessarily depended upon the resolution of a substantial question of federal patent law, the court found that it had jurisdiction under section 1338(a). *See id.*

Plaintiffs, opposing remand, rely on a series of cases involving similar Hatch–Waxman issues and generic drugs. Two of those cases, *In Re Cardizem CD Antitrust Litigation,* 90 F.Supp.2d 819 (E.D.Mich.1999) and *Aetna U.S. Healthcare v. Hoechst Aktiengesellschaft,* 54 F.Supp.2d 1042 (D.Kan.1999) are very similar to the case at bar. One very recent case, *Drug Mart Pharmacy Corp. v. Abbott Labs.,* No. 99–MDL–1317 (S.D.Fla.

2000), pleaded claims identical to those in the instant complaint, under §§ 340 and 349 of the N.Y. Gen. Bus. Law. In all of those cases, the federal courts concluded that, while patent validity issues were implicated, they were not central to proving the elements of plaintiffs' claims.

*Drug Mart* deserves the closest look because the complaint in all material respects is identical to this one. Plaintiff Drug Mart alleged violations of New York's antitrust and consumer protection laws, G.B.L. § 340 and § 349, arising from defendant's allegedly sham litigation and subsequent illegal agreements to pay generic drug manufacturers millions of dollars not to market, or to delay the introduction of, their generic versions of the drug Hytrin. Judge Seitz distinguished *Hunter Douglas* by noting that all theories on which Hunter Douglas could prevail— i.e. proving falsity by the defendants— depended on resolving a question of federal patent law. *See id.* In contrast, the plaintiffs in *Drug Mart* alleged theories of sham patent litigation and illegal agreements to restrain trade, neither of which "arises under" patent law. *See id.* (citing *Christianson*, 486 U.S. at 813, 108 S.Ct. 2166). The court concluded that the fact that an element of a particular theory is governed by patent law did not mean that the entire claim arises under patent law. *See id.*

The following is a review of the elements of the claims appearing on the face of plaintiff Altman's complaint.

### 1. *N.Y.G.B.L. § 340*

Plaintiff alleges two counts of an agreement in restraint of trade and one count of a conspiracy to monopolize under the Donnelly Act, N.Y. Gen. Bus. Law § 340.

■ To make out an action under the Donnelly Act, plaintiff must plead elements similar to those required for a federal antitrust claim. Although the Sherman and Donnelly Acts differ in some areas, they require identical basic elements of proof for claims of monopolization or attempt to monopolize. *See, e.g., Int'l Television Productions Ltd. v. Twentieth Century–Fox Film Corp.*, 622 F.Supp. 1532, 1540 (S.D.N.Y.1985). Thus, in order to state a claim under the Donnelly Act, plaintiff must 1) identify the relevant product market; 2) describe the nature and effects of the purported conspiracy; 3) allege how the economic impact of that conspiracy is to restrain trade in the market in question; and 4) show a conspiracy or reciprocal relationship between two or more entities. *See id.*

■ Furthermore, courts consistently have adhered to the principle that to have standing to sue, antitrust injury must be demonstrated, regardless of the type of antitrust violation asserted. *Atlantic Richfield Co. v. U.S.A. Petroleum, Co.*, 495 U.S. 328, 341–42, 110 S.Ct. 1884, 1892, 109 L.Ed.2d 333 (1990). To state an antitrust claim, a plaintiff must show both (1) "that the defendants' conduct caused [plaintiffs] an injury," and (2) that such an injury is an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from what makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir.1994) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)).

A patent holder has a legal monopoly and a concomitant "right to invoke the State's power to prevent others from utilizing his discovery without his consent." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1203 (2d Cir.1981) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)). Simply put, a patent holder is permitted to maintain his patent monopoly through conduct that is permissible under the patent laws. *See id.* Because "antitrust laws do not negate the patentee's right to exclude

others from patent property," *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1362 (Fed.Cir.1999); *Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 873 (Fed. Cir.1997), *cert. denied,* 525 U.S. 815, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998) (holding that a "patentee may lawfully police a market that is effectively defined by its patent"), defendant asserts that plaintiff cannot prove the "injury in fact" element of her case without challenging the validity of the patent itself.

Both *Christianson* and *Drug Mart* involved allegations of monopolization, as does plaintiff Altman's Donnelly Act claim in this action. It is true that those plaintiffs, like plaintiff Altman, asserted theories of monopolization other than patent misuse, such as making false statements, filing a lawsuit in bad faith and urging potential customers to refrain from doing business with plaintiff (*Christianson*); and entering into illegal agreements (*Drug Mart*). Yet even with that, in both *Christianson* and *Drug Mart,* the plaintiff would have had to prove injury-in-fact in order to prevail. And plaintiff Altman virtually conceded that she could not prove injury-in-fact without establishing that the Cipro patent was invalid, since counsel admitted at oral argument that Bayer has an absolute right to keep generics out of the market until 2003 if the patent is valid.

Nonetheless, neither the Supreme Court in *Christianson* nor Judge Seitz in *Drug Mart* mentioned the injury-in-fact requirement, and obviously neither court viewed its undeniable existence as a bar to its conclusion that the antitrust claims in the cases before them did not "arise under" federal patent laws. This Court can only assume that the United States Supreme Court was aware that an antitrust plaintiff had to prove injury-in-fact when it decided *Christianson,* and concluded (albeit *sub silentio*) that injury-in-fact, while a predicate to standing was not an "element" of a claim of monopolization—even if this particular predicate to standing depended on a showing that the patent was invalid. It

is not intuitively obvious to this Court why this should be so, but it is the only reading of *Christianson* that supports the result reached by the Supreme Court. And if this reading is correct, then plaintiff's counsel was also correct when he asserted—at oral argument that the instant complaint "was *Christianson*" and should be remanded to the State Supreme Court.

### 2. *N.Y.G.B.L. § 349*

Not only does plaintiff assert alternate theories for recovery under section 340, she also brings a second claim under N.Y. Gen. Bus. Law § 349, alleging that the Stipulation and Agreement between Bayer and Barr amounted to a deceptive trade practice contrary to New York law.

■ To state a claim under section 349, the complaint must plead that (1) the defendant's conduct was consumer-oriented; (2) the defendant engaged in a materially deceptive and misleading act; and (3) plaintiff was injured by the defendant's act. *See S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.,* 84 F.3d 629 (2d Cir. 1996); *Abraham v. Penn Mutual Life Insurance Co.,* 2000 WL 1051848 (S.D.N.Y. July 31, 2000). Although ostensibly directed at "any business," section 349 is in fact only "directed at wrongs against the consuming public," *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 24–25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995).

Plaintiff here contends that the Agreement between Bayer and Barr, in which Barr agreed to refrain from marketing its Cipro generic equivalent, was entered to avoid triggering the 180 day exclusivity period, and to prevent other generic manufacturers from entering the market. The result was that class members were injured by paying prices for Cipro that were "supracompetitive," i.e., substantially higher than the prices that Plaintiff and members of the Class would have paid absent the allegedly deceptive and misleading stipulation.

Plaintiff cites a two cases with similar facts, *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft,* 54 F.Supp.2d 1042 (D.Kan.1999) and *In Re Cardizem CD Antitrust Litigation,* 90 F.Supp.2d 819 (E.D.Mich.1999). *Aetna* involved a suit alleging unfair competition in violation of the Kansas Trade and Consumer Protection Act.[2] There, plaintiff charged that defendants violated Kansas law by instigating patent litigation to hold up FDA approval of a generic version of Cardizem, a drug to treat high blood pressure. The Andrx Pharmaceutical Company had applied to the FDA to approve a generic version of Cardizem, and HMR responded by filing a patent infringement action against Andrx. *See id.* at 1046. As the FDA did in the present case, the FDA gave preliminary approval to Andrx's generic drug, and HMR entered into a "stipulation agreement" with Andrx. The agreement provided that HMR would make quarterly payments to Andrx in exchange for Andrx' dismissing its claims in the patent suit, refraining from marketing its generic drug until the end of the suit, continuing to prosecute its claim for FDA approval, and asserting its rights as first in line against other potential producers of generic drugs. *See id.*

After the agreement, HMR and Andrx "did not actively pursue" their patent suit, Andrx did not begin selling its generic product, and the 180 day Hatch–Waxman period did not begin to run. *See id.* Consequently, producers of competing generic products were unable to compete against either HMR or Andrx. *See id.* at 1047. Plaintiffs alleged that the defendants acted

for the sole purpose of delaying and preventing competition. *See id.* at 1053. The defendants removed to federal court, arguing that plaintiffs' claims hinged on the validity of defendants' patents, raising a substantial question of patent law. The court disagreed, concluding that plaintiffs claims did not depend on whether the defendants' patents were valid—only whether defendant had an impure heart when it filed suit. *See id.* Judge Vratil explained: "Any discussion of patent law is merely tangential to plaintiffs' claim that [defendant] had an ill motive which resulted in unfair competition. While federal law may be implicated in an examination of [defendant's] motives, it is hardly a substantial or necessary part of plaintiffs' claim." *Id.* at 1054.

Similar suits were consolidated and tried in the *In Re Cardizem CD Antitrust Litigation,* 90 F.Supp.2d 819 (E.D.Mich.1999). In *Cardizem,* plaintiffs alleged that defendants violated various state antitrust statutes and common law principles of unjust enrichment by instigating patent litigation for the sole purpose of delaying and preventing competition. *See id.* at 839. The Michigan court, relying entirely on the reasoning in *Aetna,* concluded that plaintiff's allegations of impure heart when it filed patent infringement suit did not depend on resolution of a substantial question of federal law. *See id.*

Altman's § 349 theories are virtually identical to those alleged in *Cardizem* and *Aetna.* Here, the plaintiff has alleged that defendants acted with an impure heart when Bayer brought litigation against

---

**2.** The other cases cited by plaintiff involved causes of action sounding in breach of contract. Issues of patent law were tangential to the plaintiff's right to relief in those cases, therefore preventing federal courts from exercising "arising under" jurisdiction. *See, e.g., Design Science Toys, Inc. v. McCann,* 931 F.Supp. 282, 283 (S.D.N.Y.1996) (acknowledging that while "the resolution of some of these claims requires determination of which party has ownership rights to the Fee–Bee patent, the fact that a patent is the property that is the subject of a contractual or owner-

ship claim does not make that claim any less a question of state law, and therefore is not a basis for removal."); *Coditron Corp. v. AFA Protective Systems, Inc.,* 392 F.Supp. 158 (S.D.N.Y.1975) (holding that, as structured, the suit represented essentially a contract dispute notwithstanding the fact that patents were peripherally mentioned); *Kaufman Malchman & Kirby v. Hasbro,* 897 F.Supp. 719, 721 (S.D.N.Y.1995) ("When patent issues are merely implicated incidentally in a cause of action, however, federal courts do not have jurisdiction of the case pursuant to 1338.").

Barr for patent infringement; entered the Stipulation to extend the 30–month waiting period; signed the Agreement in which Barr agreed not to market its generic Cipro in exchange for $24.5 million; and entered into a consent judgment acknowledging the validity of Bayer's patent. Following *Christianson*, plaintiff's alternate theories make it unnecessary to resolve any substantial question of patent law for plaintiff to prevail.

The motion to remand is therefore granted.

This constitutes the decision and order of the Court.