In re CIPROFLOXACIN HYDRO-
CHLORIDE ANTITRUST
LITIGATION.

No. MDL–00–1383 (DGT).

United States District Court,
E.D. New York.

Oct. 1, 2001.

---

5. *See* N.Y. C.P.L.R. § 5004 (McKinney 1992)

### MEMORANDUM AND ORDER

TRAGER, District Judge.

#### Introduction

This motion presents a difficult question of federal jurisdiction. Plaintiffs have brought multiple putative class action lawsuits in various state courts, claiming defendants violated state antitrust laws and related state statutes by agreeing to prevent competition by generic drug manufacturers in the market for the antibiotic ciprofloxacin hydrochloride. Defendants removed these cases to federal court on the grounds of federal question and diversity jurisdiction, and plaintiffs have moved to remand their cases to state court.

Before the remand motions were resolved, the actions were transferred to the Judicial Panel on Multidistrict Litigation ("JPML"), which in turn transferred the actions to this Court. Presently before the Court are plaintiffs' motions to remand in the following eight actions: *Lee v. Bayer A.G.*, CV–00–4731 (CA); *Garber v. Bayer A.G.*, CV–00–4529 (CA); *Patane v. Bayer A.G.*, CV–00–9099 (CA); *Samole v. Bayer Corp.*, CV–00–4530 (CA); *Ozarow v. Bayer Corp.*, CV–00–8922 (FL); *Platt v. Bayer Corp.*, CV–01–2155 (TX); *Relles v. Bayer Corp.*, CV–00–12453 (CA); *Sandhaus v. Bayer Corp.*, CV–00–2527 (KS).[1] A number of courts have addressed similar

---

1. Another state court action, *Meyers v. Bayer Corp.*, CV–01–3924 (DGT), originally filed in Wisconsin, was transferred to this Court only after the remand motions in the eight cases listed above had been briefed and argued. *See* Transcript of Oral Arguments on Motions to Remand ("Tr."), 8–9. After defendants removed the action to the United States District Court for the Eastern District of Wisconsin, plaintiffs in *Meyers* moved for remand. The Wisconsin federal district court rejected defendants' claims of diversity jurisdiction, and declined to reach defendants' federal question arguments. *See Meyers v. Bayer AG*, 143 F.Supp.2d 1044 (E.D.Wis.2001). The federal

motions, and the overwhelming majority have found federal jurisdiction lacking.[2] Although the issue is a particularly close one, the motions to remand to state court are granted.

### Background [3]

Defendants Bayer A.G., a German company,[4] and its American subsidiary, Bayer Corporation, ("Bayer") are the manufacturers of Cipro, the brand name of the widely used antibiotic, ciprofloxacin hydrochloride ("ciprofloxacin"). Ciprofloxacin, a wide-spectrum antibiotic, is prescribed for a variety of infections, and is dispensed in tablet, liquid, and intravenous forms. Cipro has been the best-selling antibiotic in the world for the past eight years, and is the eleventh most-prescribed drug in the United States. Bayer has earned more than $1 billion from sales of Cipro in the United States alone.

Bayer claims the active ingredient in Cipro, ciprofloxacin hydrochloride, under patent number 4,670,444 (the "'444 patent"). The '444 patent was filed with the Patent and Trademark Office ("PTO") on May 29, 1984, and issued to Bayer on June 2, 1987. In October 1987, Miles, Inc., then a subsidiary of Bayer and the licensee of the '444 patent, obtained FDA approval to market the drug. Since 1987, defendant Bayer has been the only producer of ciprofloxacin in the United States.

On October 27, 1991, defendant Barr Laboratories, Inc. ("Barr"), filed an "Abbreviated New Drug Application" ("ANDA") for a generic bioequivalent version of the "pioneer" drug Cipro. An ANDA filing is governed by the Drug Price Competition and Patent Term Restoration Act of 1984, known commonly as the Hatch Waxman Act. The Act provides a simplified and shortened method of obtaining FDA approval to bring generic bioequivalent drugs to the marketplace. The Hatch Waxman Act also provides incentives for generic competition in pharmaceuticals by granting a 180–day period of market exclusivity to the first generic entrant on the market. *See* 21 U.S.C. § 355 *et seq.* Hatch Waxman also minimizes the time it takes for a generic drug to enter the market by permitting a new drug applicant to affirm to the FDA that the drug it seeks to market contains the same active ingredient(s) as a drug already approved and listed by the FDA, and is the listed drug's bioequivalent. *See* 21 U.S.C. § 355(j). An ANDA filing incorporates the conclusions and data concerning safety and effectiveness yielded by research conducted by the pioneer drug manufacturer, thereby expediting the FDA approval process.

Along with information regarding the petitioned drug's active ingredient(s), ef-

---

question issues raised in *Meyers* are fully addressed below.

**2.** *See McGrew v. Schering–Plough Corp.,* No. CIV.A. 01–2311–GTV, 2001 WL 950790 (D.Kan. Aug.6, 2001); *Altman v. Bayer Corp.,* 125 F.Supp.2d 666 (S.D.N.Y.2000) (addressing the same agreement between Bayer and Barr at issue in this multi-district litigation); *In re Terazosin Hydrochloride Antitrust Litig.,* No. 99–MDL–1317 (S.D.Fla. Aug. 28, 2000); *In re Cardizem CD Antitrust Litig.,* 90 F.Supp.2d 819, 836 (E.D.Mich.1999) (collecting additional cases); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft,* 54 F.Supp.2d 1042 (D.Kan.1999); *Betnor, Inc. v.*

*Hoeschst Aktiengesellschaft,* Nos. C–98–3609 MHP and C–98–4729 MHP (N.D.Cal. Apr. 14, 1999). *But see Koonan v. Barr Laboratories,* No. C–01–0779 MHP (N.D. Cal. June 25, 2001) (denying motion to remand); *Aetna U.S. Healthcare, Inc. v. Hoechst,* No. 99–124 DWF/AJB (D.Minn. Apr. 29, 1999) (same).

**3.** The facts as recited here are drawn from plaintiffs' complaints, each of which raises virtually identical allegations.

**4.** On May 8, 2001, Magistrate Judge Gold issued an order permitting plaintiffs to serve defendant Bayer A.G. in Germany.

fective dosage, strength, and course of administration, the ANDA filer is required to submit a certification regarding its conclusions about the applicability of existing patents to the generic drug. *See* 21 U.S.C. § 355(j)(2)(A)(vii). Specifically, and of special significance in this case, an ANDA filer may indicate it believes the patent held by the pioneer drug manufacturer is either invalid or would not be infringed by the generic, bioequivalent version for which it seeks approval. *See id.* If an ANDA filer certifies that the existing patent is invalid, it must notify the patent holder that it has filed an ANDA and state the factual and legal bases for its contention that the existing patent is invalid. *See* 21 U.S.C. § 355(j)(2)(B). The patent holder then has forty-five days upon receipt of the letter to initiate a patent infringement suit against the ANDA filer. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

Hatch–Waxman provides that, during the ensuing patent litigation, FDA consideration and approval of the generic ANDA will be stayed for thirty months from the date the notice of non-infringement is sent, or until a final, non-appealable determination regarding the invalidity of the patent is entered, whichever date is earlier. *See* 21 U.S.C. § 355(j)(5)(B)(iii). The court hearing the patent case may, in its discretion, extend the stay if the litigation is not resolved within the thirty month period provided by the statute. *See* 21 U.S.C. § 355(j)(5)(B)(iii). It seems relatively clear, however, that if there is no resolution of the patent litigation and a stay is not granted, and the patent holder has not obtained preliminary injunctive relief, the ANDA filer may begin to market its product. In such an instance, the ANDA filer assumes the risk it might be found liable for infringing the pioneer manufacturer's

patent. As noted, Hatch Waxman further provides that the first generic manufacturer to have filed an ANDA that has gained FDA approval enjoys a 180 day period of market exclusivity from the date the applicant first sells its product or the date on which a final, non-appealable order determining the invalidity of the patent is entered, whichever is earlier. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

Barr contended in its 1991 ANDA application that Bayer's '444 patent was invalid and unenforceable. As provided for in Hatch–Waxman, Barr notified Bayer of its ANDA filing, and Bayer responded by initiating a patent suit against Barr. Bayer filed its suit on January 16, 1992, within the 45 day statutory period, in the Southern District of New York. Barr answered and interposed counterclaims seeking a declaration that the '444 patent was invalid and unenforceable. On November 31, 1992, Bayer and Barr entered into a stipulation agreeing to extend the 30 month period until the patent court entered a final judgment. The stay otherwise would have expired on July 16, 1994. Under the terms of the stipulation, Barr agreed that it would not manufacture, use, or sell ciprofloxacin hydrochloride in the United States until a final judgment was entered. It is unclear what consideration, if any, Barr received from Bayer in return for agreeing to the terms of the stipulation.

Plaintiffs assert that on January 6, 1995, Barr received tentative FDA approval to manufacture and market ciprofloxacin tablets. *See, e.g., Garber* Compl., ¶ 49; Barr Laboratories, Inc. Annual 10K, Jan. 30, 1995; *see also Bayer Will Pay Barr, Rugby Laboratories To Settle Patent Suit,* Wall St. J., Jan. 20, 1997, at B5 (stating that Barr received FDA approval in January 1997).[5] Subsequently, in June 1996,

---

**5.** Defendants allege Barr has, in fact, never received FDA approval to market ciprofloxacin. *See* Def. Mn. to Remand, at 6. Defen-

dants do not dispute, however, that the ciprofloxacin product for which Barr sought FDA

the Southern District denied Bayer's and Barr's partial cross-motions for summary judgment in the patent litigation.

On January 8, 1997, the parties in the patent suit, as well as certain of the other defendants in this action, the Rugby Group ("Rugby") and Hoechst Marion Roussel, Inc. ("HMR"),[6] entered into a settlement agreement ("Agreement"). The terms of the Agreement, which form the bases for plaintiffs' allegations of an unreasonable restraint of trade, require Barr to recognize the validity and enforceability of Bayer's patent for Cipro, and not to manufacture or market ciprofloxacin until the patent expires. The Agreement further requires Bayer to pay Barr and Rugby each an initial lump-sum amount of $24.55 million, and grants Bayer the option of either paying Barr and HMR or Rugby each $25 million per year from March 1998 to December 2003, the date the '444 patent expires, or of supplying Barr and HMR or Rugby with ciprofloxacin to market and distribute under a generic label. To date, Bayer has elected to make the $25 million payments, rather than grant Barr and the other defendants a license to market and distribute a generic version of Cipro. In short, Bayer agreed to pay Barr and the other defendants over $100 million, and Barr agreed to drop its challenge to the validity of Bayer's patent and its plans to market generic ciprofloxacin.

At the same time defendants executed the Agreement, Bayer and Barr entered into a consent judgment ("Judgment"), which was "so ordered" by the district court on January 16, 1997, and which extinguished all claims raised in the patent litigation. The Judgment affirmed the validity and enforceability of the '444 patent, and acknowledged that Barr had infringed that patent. The consent judgment did not refer in any way to the specific terms of the Agreement, and spoke only to the claims between the parties to the patent lawsuit, Bayer and Barr. The consent judgment also made no mention of the involvement of either HMR or Rugby in the Agreement.

The Agreement has spawned nearly 30 lawsuits across the United States. The class-action suits consolidated here and addressed by this opinion are among those filed by indirect purchasers of Cipro. These customers, situated at the end of the chain of distribution, allege defendants, by executing the Agreement and Judgment terminating the patent claims between Bayer and Barr, unlawfully restrained trade in the market for ciprofloxacin, and effectively eliminated the possibility of generic competition. Plaintiffs allege these acts were committed in contravention of the antitrust and consumer protection laws of the states in which the various suits were filed, and caused them injury because, but for the unlawful agreement, plaintiffs would have had access to generic ciprofloxacin at a price lower than that charged for the brand name drug, Cipro.

approval was the bioequivalent of Cipro. Hatch Waxman indicates that consideration and approval of ANDA applications to market generic bioequivalents is expedited after a 30–month stay. There is no question the 30–month stay provision had expired and that a stay remained in effect only by virtue of the parties' stipulation, which the Southern District so ordered on December 8, 1992. *See, e.g., Garber* Compl., ¶ 48.

6. Defendant Rugby is a manufacturer and distributor of generic pharmaceuticals. Defendant HMR was the parent company of Rugby until it sold its interest to defendant Watson Pharmaceuticals ("Watson"), a company which produces and distributes off-patent and branded drugs. Interestingly, on March 29, 1996, HMR agreed to assist Barr in financing its patent litigation. Defendant Watson Pharmaceuticals was not a signatory to the allegedly unlawful agreement.

As noted above, these actions were filed in state court and removed by defendants on grounds of federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332.[7] Plaintiffs now move to remand these actions to state court. For the reasons discussed below, plaintiffs' remand motions are granted.

### Discussion

■ The removal statute, 28 U.S.C. § 1441, provides, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." Because the right to remove a state court action to federal court is statutory, it must be invoked in strict conformity with statutory requirements. *See American Fire & Cas. Co. v. Finn*, 341 U.S. 6, 10–12, 71 S.Ct. 534, 538, 95 L.Ed. 702 (1951); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941); *Somlyo v. J. Lu–Rob Enters., Inc.*, 932 F.2d 1043, 1045–46 (2d Cir.1991). Moreover, "[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." *Somlyo*, 932 F.2d at 1045–46 (citing *Shamrock Oil*, 313 U.S. at 108, 61 S.Ct. at 872). Finally, a defendant opposing remand bears the burden of establishing that removal was proper. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990); *United Food & Commercial Workers Union v. CenterMark Props.*, 30 F.3d 298, 301 (2d Cir.1994). A court is required to keep these principles in mind as it evaluates a defendant's proffered bases for removal.

■ As discussed above, these actions were transferred to this Court by order of the JPML. In deciding any questions of federal law raised by these motions to remand, the applicable law is that of our circuit, rather than the law of the transferor courts. *See, e.g., Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993); *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175–76 (D.C.Cir.1987).

### (1)

### Federal Question Jurisdiction

In opposition to remand, defendants first argue that removal is proper because this Court has federal question jurisdiction over plaintiffs' claims in each of the eight actions. Federal question jurisdiction applies to "all civil actions arising under" federal law. 28 U.S.C. § 1331. Not surprisingly, then, "the vast majority of cases brought under the federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action." *Christianson v. Colt Industries Oper. Corp.*, 486 U.S. 800, 821, 108 S.Ct. 2166, 2180, 100 L.Ed.2d 811 (1988) (Stevens, J., concurring) (citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986)). In the cases before this court, however, each of the causes of action is brought under state law. Defendants contend that federal question jurisdiction nonetheless applies because plaintiffs' state law claims implicitly raise a question of federal patent law.

■ Under the well-pleaded complaint rule, a defendant may not remove a case to federal court unless plaintiff's complaint—

7. Defendants allege that diversity and federal question jurisdiction exists in *Relles, Ozarow, Platt,* and *Sandhaus*. In the other actions, defendants base removal solely on federal question jurisdiction.

standing alone—establishes that the case arises under federal law within the meaning of Section 1331. *See Franchise Tax Bd. of California v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 10, 103 S.Ct. 2841, 2846–47, 77 L.Ed.2d 420 (1983); *Phillips Petroleum Co. v. Texaco, Inc.,* 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003–04, 39 L.Ed.2d 209 (1974). Where state law causes of action are alleged, federal defenses that the plaintiff anticipates defendant may assert are simply irrelevant to the determination of whether there is federal question jurisdiction. Similarly, it is also irrelevant that sometime during the course of litigation a federal question may arise. *See Franchise Tax Bd.,* 463 U.S. at 10, 103 S.Ct. at 2846.

Defendants, in their notice of removal, assert plaintiffs' "right to relief necessarily depends on resolution of a substantial question of federal patent law." Notice of Removal, *Garber v. Bayer,* ¶ 4 (quoting *Christianson,* 486 U.S. at 809, 108 S.Ct. at 2174). Specifically, defendants contend, "plaintiff must prove ... that Bayer's patent for the drug [Cipro] is invalid. Without proving the patent is invalid, plaintiff cannot prove he has been damaged. The validity of the patent is therefore a 'necessary element of one of the well-pleaded claims....'" *Id.* (quoting *Hunter Douglas Inc. v. Harmonic Design,* 153 F.3d 1318, 1324 (Fed.Cir.1998) *overruled in part by Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1358–59 (Fed.Cir.1999)). Defendants' argument is essentially that, imbedded in plaintiffs' claims for relief under the various state antitrust and consumer protection laws, there lies a substantial question of patent law. Defendants contend that, because antitrust plaintiffs must plead and prove injury,[8] a court must first resolve the valid-

ity of the '444 patent, as Barr could not have lawfully entered the market unless the patent was invalid. Thus, defendants contend plaintiffs' claims "arise under" federal patent law.

The Supreme Court in *Christianson* had occasion to consider the circumstances under which causes of action claiming antitrust violations nevertheless "arise under" the patent laws. The *Christianson* Court held that a claim arises under federal patent law if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law in that patent law is a necessary element of one of the well-pleaded claims." *Christianson,* 486 U.S. at 809, 108 S.Ct. at 2174. The *Christianson* Court stated that "[well-pleaded claims] supported by alternative theories in the complaint may not form the bas[es for patent] jurisdiction *unless* patent law is *essential* to each of those theories." 486 U.S. at 810, 108 S.Ct. at 2174 (emphasis added). Remand is thus required unless each and every theory of liability advanced by plaintiffs under the state antitrust laws depends upon resolution of a patent law question. *See Christianson,* 486 U.S. at 809–10, 108 S.Ct. at 2174–75; *Hunter Douglas,* 153 F.3d at 1329; *AT & T v. Integrated Network Corp.,* 972 F.2d 1321, 1323–24 (Fed.Cir. 1992).

 Plaintiffs' allegations must be taken as true for purposes of these motions. *See Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987) (stating "federal question jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint"); *cf., Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991). A review of those allegations

---

**8.** Injury-in-fact is a necessary element of an antitrust claim under the laws of the states

pertinent to this action.

makes plain that plaintiffs have asserted at least one theory by which they may establish state antitrust violations without resorting to a determination of patent law. Plaintiffs' complaints allege there would have been generic competition in the market for ciprofloxacin prior to the expiration of Bayer's patent if Bayer had not reached an unreasonably anti-competitive agreement with Barr, HMR, and Rugby. *See Relles* Compl., ¶¶ 33–37; *Sandhaus* Compl., ¶¶ 30–32; *Garber* Compl., ¶¶ 53, 59–64; *Ozarow* Compl., ¶¶ 41–45; *Platt* Compl., ¶¶ 44, 48–51; *Samole* Compl., ¶¶ 52–63; *Lee* Compl., ¶¶ 44–51; *Patane* Compl., ¶¶ 51–62. At oral argument, plaintiffs expanded upon the theories advanced in their complaints, and asserted that, as a matter of fact, Bayer would have authorized Barr to distribute ciprofloxacin by granting Barr a license, or by other means, had Barr not agreed to drop its challenge to the validity of the '444 patent in exchange for large cash payments. *See* T., at 53, 73. Rather than challenge Bayer's patent or seek a licensing arrangement, contend plaintiffs, Barr and the other defendants in these actions signed the Agreement, accepting money from Bayer in return for their promise not to challenge Bayer's patent or otherwise seek to compete with it. Plaintiffs thus allege that any possibility that Bayer, Barr and the other defendants would have reached a business arrangement permitting the sale of a lower cost, generic version of Cipro during the life of Bayer's patent was eliminated by the profit-sharing agreement executed by defendants. Plaintiffs contend that, as a result, they were denied the opportunity to purchase ciprofloxacin at competitive, or at least lower, prices. This result is sufficient to satisfy the "injury-in-fact" element of an antitrust claim. *See, e.g., Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (stating the "Sherman

Act was enacted to assure customers the benefits of price competition...."); *George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Capital Imaging v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 543 (2d Cir.1993)) ("[t]he antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market....' ").

Defendants correctly point out that patent holders have no duty to grant licenses, *see, e.g., United States v. Westinghouse Electric Corp.,* 648 F.2d 642, 647 (9th Cir. 1981) (omitting citation) and that Bayer's failure to grant a license therefore can not form the basis of a cause of action under any state's antitrust laws. However, plaintiffs do not contend that Bayer breached a duty to license. Rather, plaintiffs assert in their state law complaints that Barr would *in fact* have entered the market with a generic version of ciprofloxacin prior to the expiration of Bayer's patent. Any license or other arrangement for distributing a generic version of ciprofloxacin was forestalled by the Agreement, which provided defendants with a more attractive resolution of the patent challenge.

Moreover, even if patent law would have legitimized the original Bayer Barr agreement which would otherwise have been unlawful under state law, that smacks of a defense more than that of a failure of plaintiffs to state a viable cause of action under state law. To the extent that defendants' assertion that their patent law rights provides a viable defense to plaintiff's state law claims, that is an insufficient basis for remand. *See Franchise Tax Board,* 463 U.S. at 10–11, 103 S.Ct. at 2846–47.

Defendants also argue that, because consumers have no right to purchase an infringing product, plaintiffs' claims of antitrust injury depend upon a showing that the '444 patent is invalid. However, plaintiffs do not contend in their complaints that they were denied the right to purchase infringing generic drugs. Rather, plaintiffs claim defendants violated state antitrust laws by depriving them of their right to a market in which manufacturers and distributors of generic drugs made their decisions about challenging patents and entering markets free from the influence of cash payments amounting to unreasonable restraints of trade. If in fact Bayer would have licensed or authorized Barr to distribute ciprofloxacin rather than risk the loss of its patent, plaintiffs would have benefitted from the resulting competition, and there would never have been a judicial determination of the validity of Bayer's patent.

■ Plaintiffs contend that their state law antitrust claims thus do not depend upon a finding that Bayer's patent is invalid; plaintiffs assert that they may prevail, regardless of the patent's validity, by demonstrating that Bayer would have granted a license or otherwise authorized Barr to distribute ciprofloxacin had Bayer and Barr not entered into the Agreement. Defendants' counter-argument, that the existence of a valid patent forecloses the possibility of any antitrust injury, suggests patent holders, by virtue of their intellectual property rights, wield almost limitless power to control the market for the patented product. Yet it cannot be stated that the patent "exception" swallows the prohibitions against monopolies and trusts as a whole; even the holder of a valid patent may be subject to liability for conduct amounting to an unreasonable restraint of trade.

In *Andrx Pharmaceuticals v. Biovail Corp. Int'l,* 256 F.3d 799 (D.C.Cir.2001),

the court confronted an agreement between Hoechst Marion Roussel, Inc., the holder of a patent claiming the drug Cardizem CD, and Andrx, which had filed an ANDA seeking approval to market a generic equivalent. The agreement provided that, in return for substantial payments from Hoechst, Andrx would refrain from marketing its generic version of Cardizem CD, and would not relinquish its rights to an exclusive period of distribution as the first ANDA filer. The agreement was thus similar to the Bayer Barr agreement at issue in this case.

Biovail also sought to market a generic version of Cardizem CD, and filed a claim challenging the agreement between Hoechst and Andrx under the Sherman Act. Andrx sought dismissal of Bioval's claim, asserting among other things that, under the Hatch Waxman Act, it had the legal right as the first ANDA filer to delay marketing its generic equivalent indefinitely. The Court of Appeals reversed the district court's order of dismissal with prejudice, reasoning as follows:

> One can fairly infer . . . that but for the Agreement, Andrx would have entered the market. . . . Although it is true that the first to file an ANDA is permitted to delay marketing as long as it likes, the statutory scheme does not envision the first applicant's agreeing with the patent holder of the pioneer drug to delay the start of the 180–day exclusivity period. . . . By accepting payments from HMRI, Andrx received the benefit of the 180–day exclusivity period without starting the clock. By agreeing with HMRI to share HMRI's profits from the sale of Cardizem CD, it was able to exclude other competitors from entering the market. Andrx's commitment not to trigger the running of the 180–day exclusivity period could have caused Biovail's injury . . . by denying it the ability to proceed to market with its own gener-

ic version. Although the 180–day provision of the Hatch Waxman Amendments legally barred it from selling its product, Andrx's manipulation of the exclusivity period trigger date extended the bar. 256 F.3d at 809–10. In short, the Court in *Andrx* concluded that a party challenging an agreement similar to the Bayer Barr agreement at issue in this case could state a claim for antitrust injury without first demonstrating that the pioneer drug company's patent was invalid. *See also Cellular Plus, Inc. v. Superior Court,* 14 Cal. App.4th 1224, 1241–1242, 18 Cal.Rptr.2d 308 (Cal.Ct.App.1993) (holding that approval by regulators of rates charged by cellular service providers did not preclude a finding of liability and injury under the Cartwright Act where providers were charged with agreeing to fix prices). Even defendants, when asked at oral argument whether it would be permissible under the antitrust laws for entities to collude to prevent the filing of an ANDA application, acknowledged that "one can go beyond the scope of the patent and violate the antitrust laws." *See* T., at 13. If colluding to prevent an ANDA filing is going too far, it is difficult to say as a matter of law that the Bayer–Barr Agreement is not.

No assessment of the likelihood that plaintiffs will succeed in establishing the facts supporting their theory is required. Whether this Court has subject matter jurisdiction over plaintiffs' causes of action is determined by reviewing the well-pleaded allegations of their complaints. It is worth noting, however, that plaintiffs' allegations are hardly implausible. At least one commentator has noted that the inter-play between patent law and the Hatch Waxman Act provides enticing opportunities for anticompetitive behavior, concluding that

> there is a significant temptation for an innovator company and a would-be generic competitor to use certain Hatch Waxman provisions to perpetuate rather than erode whatever market power the innovator has by virtue of its patent protection for the drug in question. This can be achieved by reaching a settlement or partial settlement of patent litigation that delays generic entry and allows the innovator and generic challenger to 'share the wealth'—that is, to share what antitrust lawyers and economists like to call "rents," or supracompetitive returns.

David A. Balto, *Pharmaceutical Patent Settlements: The Antitrust Risks,* 55 Food & Drug L.J. 321, 326 (2000). The terms of the Agreement demonstrate Bayer was willing to share tens of millions of dollars of "supracompetitive returns" to end its patent litigation with Barr. Particularly because patent settlements typically provide for payments by the alleged infringer to the patent holder, payments like those made by Bayer, the pioneer drug company, to Barr, a potential generic competitor, may "suggest strongly the anticompetitive intent of the parties in entering the agreement and the rent-preserving effect of that agreement." *Id.* at 335.[9]

The *Christianson* Court made plain that, if patent law is not an essential element of each of plaintiffs' theories of recovery, those claims do not "arise under"

---

9. It is also significant that, under the Hatch–Waxman Act, 180 days after Barr's entry into the market, generic competitors like HMR and Rugby might have entered the market with generic versions of ciprofloxacin. The probable result of market entry by three generic competitors would be the reduction of profits yielded by sales of both generic and brand-name Cipro. In contrast, the Agreement signed by defendants was undoubtedly intended to maintain higher prices, and profits, during the term of the Agreement, thereby shifting the incentives for generic entry and eliminating the corresponding consumer benefits which were among the goals of Hatch–Waxman.

federal patent law. Plaintiffs have pleaded at least one theory under which their claims for relief may be resolved without determining the validity of Bayer's patent. *Christianson* therefore counsels that remand of each lawsuit is appropriate. 486 U.S. at 809–10, 108 S.Ct. at 2174–75; *see also Altman v. Bayer Corp.*, 125 F.Supp.2d 666, 671–73 (S.D.N.Y.2000) (granting motion to remand on same facts presented here); *In re Cardizem CD Antitrust Lit.*, 90 F.Supp.2d 819, 839 (E.D.Mich.1999) (granting motions to remand where no claim requiring resolution of a patent issue was raised); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F.Supp.2d 1042, 1053–54 (D.Kan.1999) (rejecting argument that plaintiffs' state law claims involving unfair competition raised a substantial question of federal patent law).

*Garber*

Defendants raise an additional issue unique to the *Garber* case. Defendants argue *Garber* should not be remanded because the complaint in that case states a claim arising under the Sherman and Clayton Acts. Plaintiffs in that case allege "[d]efendants, by their co-conspirators, and Doe Defendants also violated California's Unfair Competition Act by violating the Cartwright Act; the Sherman Act ... and the Clayton Act...." *Garber* Compl., ¶ 90. This statement, standing alone, does not suggest plaintiffs are seeking relief for violations of federal law. The complaint, read as a whole, shows plaintiffs raise claims under California state law. Each of plaintiffs' claims for relief are clearly delineated, and each claim specifies the state law basis for the cause of action. The allegations in issue are contained within plaintiffs' second claim for relief, which is clearly brought pursuant to a California statute. *See Garber* Compl., at 25. The quoted passage merely reflects the California courts' reliance on federal precedent when interpreting claims brought under state antitrust law. *See, e.g., McGlinchy v. Shell Chemical Oil Co.*, 845 F.2d 802, 811 n. 4 (9th Cir.1988). In short, each of plaintiffs' claims for relief in *Garber* are based solely upon alleged violations of state, not federal, law.

### (2)

### *Diversity Jurisdiction*

Defendants assert, alternatively, that this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in the following actions: *Relles, Ozarow, Platt,* and *Sandhaus.*[10] The diversity statute provides, "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States...." It is undisputed that there is diversity of citizenship among the parties in each of the lawsuits addressed by this opinion. Thus, it must be determined whether the amounts in controversy exceed $75,000 as required by the diversity statute.

The Supreme Court has held that the party claiming diversity jurisdiction has the burden of establishing that the amount in controversy exceeds the jurisdictional minimum. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) (stating "the authorized inquiry is primarily directed to the one who claims that the

**10.** Counsel, rather than submitting multiple sets of motion papers raising the same arguments, have presented a consolidated submission raising all of the issues presented by the pending motions. To the extent identical arguments are raised in cases other than those specifically named, they are, of course, addressed and controlled by this Memorandum and Order.

power of the court should be exerted in his behalf"). The defendants' burden is to show a " 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir.1994) (citing *Moore v. Betit*, 511 F.2d 1004, 1006 (2d Cir.1975)); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–90, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938). Whether the relief sought exceeds $75,000 is a matter of federal law, and, in a multidistrict litigation such as this one, the law of the circuit where the transferee court sits governs. *See In re Cardizem CD Antitrust Lit.*, 90 F.Supp.2d at 823 (stating "[a]lthough state law dictates the nature of the claim asserted and what amounts are actually at stake, federal law will determine whether the amounts exceed the statutory minimum necessary for diversity jurisdiction."); *Menowitz*, 991 F.2d at 40; *In re Korean Air Lines Disaster*, 829 F.2d at 1175–76.

Defendants raise various arguments in support of their contention that the amounts in controversy in *Relles, Ozarow, Platt,* and *Sandhaus* exceed $75,000. Each is addressed in turn below.

*Disgorgement of the Settlement Proceeds*

■ Defendants assert plaintiffs in *Relles* and *Platt* seek disgorgement of the payments that were made, and that continue to be made, by Bayer to the other defendants in connection with the Agreement that was intended to resolve the patent litigation. Defendants argue that, if awarded, this relief would create a common fund exceeding $75,000 in which plaintiffs would have a single, undivided interest. As defendants correctly point out, when plaintiffs unite to recover a fund in which they have an undivided common interest, the entire amount of the fund is properly considered when deciding whether the threshold for diversity jurisdiction has been satisfied. *See Zahn v. Interna-*

*tional Paper Co.*, 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973).

■ Plaintiffs, however, assert that they do not seek to recover the amounts paid by Bayer to Barr, but only the amounts they overpaid for Cipro due to Bayer's and the other defendants' allegedly monopolistic conduct. In determining whether plaintiffs' claims satisfy the requirements of diversity jurisdiction, reference is made to the pleadings themselves. The language of the *Relles* and *Platt* complaints supports plaintiffs' description of their claims.

In *Relles*, plaintiffs allege defendants violated California's Unfair Competition Act ("UCA"), and that defendants "have engaged in unfair competition within the meaning of [the UCA], because Defendants' conduct has restrained competition in the California market for Cipro. Indeed, Defendants' conduct as herein alleged has caused Plaintiffs and Class members to pay supra-competitive and artificially inflated prices for Cipro. Accordingly, such conduct was substantially injurious to Plaintiffs and the Class." *Relles* Compl., ¶ 72. The *Relles* plaintiffs seek "to restore all funds to each member of the Class acquired by means of any act or practice declared by this Court to be unlawful, unfair or fraudulent...." *Relles* Compl., at 24, ¶ 3.

Similarly, plaintiffs in *Platt* allege that, "[a]s a result of Bayer's and [its] co-conspirators violations of [the Tennessee Consumer Protection Act], Bayer AG and Bayer Corporation have unjustly enriched themselves at the expense of the class. The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue." *Platt* Compl., ¶ 75. Plaintiffs seek "restitution" and "classwide relief and damages as allowed by law." *Platt* Compl., ¶¶ 78, 80.

Defendants urge these portions of the pleadings are requests for disgorgement of the proceeds of the Agreement, specifically, the payments made by Bayer to the other defendants. However, defendants' construction "adds considerable gloss" to the pleadings. *Gilman v. BHC Securities, Inc.,* 104 F.3d 1418, 1426 (2d Cir.1997) (rejecting defendants' construction of plaintiff's claims and finding the jurisdictional threshold for diversity was not met). Plaintiffs' complaints, on their faces, are consistent with requests for relief for the harm plaintiffs suffered as individuals as a result of paying inflated prices for Cipro. There is no specific indication in the pleadings that plaintiffs seek to recover the payments made by Bayer to Barr. Moreover, defendants have not shown that such a recovery would even be available under the state law claims plaintiffs advance. Generally, plaintiffs are entitled to recover only those damages *they* sustained as a result of challenged conduct. As for defendants' contention that plaintiffs have made claims for relief above and beyond those already made with regard to their individual damages, these are more fairly read as alternative theories in pursuit of the same relief. For these reasons, defendants' assertions that diversity jurisdiction exists in *Relles* and *Platt* because plaintiffs seek to recover the payments made by Bayer under the Agreement must fail.

*Plaintiff Classes Include Institutional Purchasers*

Defendants next argue that diversity jurisdiction exists in *Ozarow* and *Sandhaus* because the plaintiff classes in these cases include large, institutional purchasers that have incurred damages in excess of the jurisdictional minimum. In connection with this argument, defendants contend that, if at least one plaintiff in the class has a claim for damages in excess of $75,000, this Court would have supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims of remaining class members, even though those claims might fall below the statutory minimum of $75,000.

■ Defendants' arguments contravene the Supreme Court's holding in *Zahn,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). In *Zahn,* the Court upheld the long-standing principle that each and every class member's claim must satisfy the jurisdictional minimum for a district court to have jurisdiction over the class, and that class claims may not be aggregated to satisfy the amount in controversy. *See id.* at 312, 94 S.Ct. at 516–17; *see also Clark v. Paul Gray, Inc.,* 306 U.S. 583, 590, 59 S.Ct. 744, 749, 83 L.Ed. 1001 (1939) (preventing aggregation of several plaintiffs' claims for the purpose of satisfying the amount in controversy). Defendants urge *Zahn* was overruled by Congress' enactment of the Judicial Improvements Act of 1990, 28 U.S.C. § 1367, the "supplemental jurisdiction" statute. The parties' disagreement on this point raises an issue not yet reached by the Second Circuit. *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.,* 160 F.3d 925, 935 (2d Cir.1998). Indeed, the debate over whether Section 1367 has eroded the *Zahn* precedent is the subject of no little controversy. The circuits are divided on the issue, with the Fourth, Fifth, Seventh and Ninth finding Section 1367 to overrule the "non-aggregation" rule of *Zahn,* and the Third, Eighth, and Tenth reaching the opposite conclusion. *Compare Rosmer v. Pfizer, Inc.,* 263 F.3d 110 (4th Cir.2001); *Gibson v. Chrysler Corp.,* 261 F.3d 927 (9th Cir.2001); *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 607 (7th Cir.1997); *Stromberg Metal Works v. Press Mechanical, Inc.,* 77 F.3d 928, 931–32 (7th Cir.1996); *In re Abbott Laboratories,* 51 F.3d 524, 528–29 (5th Cir.1995) *with Trimble v. Asarco, Inc.,* 232 F.3d 946, 960–62 (8th Cir.2000);

*Meritcare Inc. v. St. Paul Mercury Ins. Co.,* 166 F.3d 214, 221–22 (3d Cir.1999); *Leonhardt v. Western Sugar Co.,* 160 F.3d 631, 640 (10th Cir.1998).

Section 1367(a) provides:

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The statute goes on to provide several instances where the exercise of supplemental jurisdiction would be prohibited, including "claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19." 28 U.S.C. § 1367(b).

Notably, the exceptions set forth in subsection (b) do not include claims brought by plaintiffs under Fed.R.Civ.P. 23. In response to this apparent omission, the Third Circuit in *Meritcare* determined there was sufficient ambiguity on the face of Section 1367 to consider its legislative history in deciding whether the statute was intended to apply in the class action context. *See* 166 F.3d at 221–22; *see also Leonhardt,* 160 F.3d at 640. An analysis of the legislative history of Section 1367 would appear to shed light on the drafters' intentions, as the omission of Rule 23 claims seems at odds with the specific exceptions made for claims brought under Rules 14, 19, and 20. *See Consumer Product Safety Comm'n v. G.T.E. Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (noting that where statutory language is clear and unambiguous, the language is regarded as conclusive, unless there is a clearly expressed legislative intent to the contrary).

Despite what some courts view as the plain meaning of Section 1367, the legislative history of Section 1367 indicates the exercise of supplemental jurisdiction over class claims not meeting the jurisdictional minimum would be inappropriate. Section 1367 was proposed by the Federal Courts Study Committee, a body formed by Congress to conduct a study of an array of problems facing the federal judiciary. *See* H.R. Rep. 101–734, at 15–16 (1990), *reprinted in* 1990 U.S.C.A.A.N. 6860, 6861–62. The House Judiciary Committee reviewed the findings of the 15–month federal courts study, and reported upon its findings with regard to the proposed supplemental jurisdiction statute. The Judiciary Committee Report reveals that Section 1367 was enacted primarily to reset the scope of pendent and ancillary jurisdiction to what it had been before the Supreme Court's decision in *Finley v. United States,* 490 U.S. 545, 555–56, 109 S.Ct. 2003, 2010–11, 104 L.Ed.2d 593 (1989). *See* H.R. Rep. 101–734, at 27–30, 1990 U.S.C.A.A.N. at 6873–76. In *Finley,* a Federal Tort Claims Act case, the Court determined the district court lacked jurisdiction over plaintiff's related claims against additional parties as to which no basis for federal jurisdiction existed. 490 U.S. at 555–56, 109 S.Ct. at 2010–11. In discussing *Finley,* the Judiciary Committee stated:

[Section 1367] would authorize jurisdiction in a case like *Finley,* as well as essentially restore the pre-*Finley* understandings of the authorization for and limits on other forms of supplemental jurisdiction.... In diversity cases, the district courts may exercise supplemental jurisdiction, except when doing so would be inconsistent with the jurisdictional requirements of the diversity statute.... In accord with case law, the subsection also prohibits the joinder or intervention of persons ... if

adding them is inconsistent with Section 1332's requirements. *The section is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to Finley.* See H.R. Rep. 101–734, at 28–29, 1990 U.S.C.A.A.N. at 6874–75 (emphasis added). Notably, the Judiciary Committee cited *Zahn*—which was decided sixteen years before *Finley*—in a footnote immediately following the above-quoted passage. *See id.* n. 17. Clearly, the quoted language suggests the passage of Section 1367 should not affect the holding of *Zahn.*

Finally, a finding that *Zahn* is not overruled by Section 1367 is consistent with the vast weight of authority in this Circuit. *See, e.g., Davies v. Belden & Blake Corp.,* No. 00 Civ. 245, 2001 WL 210471, at *2 (W.D.N.Y. Feb.20, 2001); *Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd.,* 62 F.Supp.2d 1116, 1127–28 (S.D.N.Y.1999); *Greenberg v. Trace National Holdings, Inc.,* No. 99 Civ. 306, 1999 WL 587935, at *3 (S.D.N.Y. Aug.4, 1999); *Colon v. Rent–A–Center, Inc.,* 13 F.Supp.2d 553, 562 (S.D.N.Y.1998); *McGowan v. Cadbury Schweppes, PLC,* 941 F.Supp. 344, 348 (S.D.N.Y.1996); *Benfield v. Mocatta Metals Corp.,* No. 91 Civ. 8255, 1993 WL 148978, at *4 (S.D.N.Y. May 5, 1993).

 Despite being more convinced by the opinions of Judge Posner in *Rosmer* and Judge Easterbrook in *Stromberg,* in light of the Judiciary Committee's explicit statement that Section 1367 was not intended to affect the holding of *Zahn,* and in light of the weight of precedent within

the Second Circuit, I conclude that the Second Circuit would hold that, even if one or more of plaintiffs' claims in this case exceed the jurisdictional minimum, a district court is not permitted to exercise supplemental jurisdiction over remaining class claims which do not exceed the $75,000 threshold. However, as to those plaintiffs whose claims do exceed the jurisdictional minimum, the federal courts have jurisdiction.[11]

## Attorney's Fees

Defendants also argue that the amount in controversy in *Platt* exceeds the jurisdictional minimum because the "fees sought by plaintiff are certain to be over $75,000 and are attributable solely to the named plaintiff...." *Platt,* Def. Mem. in Opposition at 1. Defendants urge that, because the claim of one class member, the named plaintiff, would exceed $75,000 if an award of attorney's fees were attributed to him, supplemental jurisdiction may be exercised over the remaining class members whose claims are below the jurisdictional minimum. As discussed above, however, I conclude that the Second Circuit would reject the view that Section 1367 overrules the holding of *Zahn.* For this reason, defendants' argument must fail.

 Even if Section 1367 supersedes *Zahn,* defendants' contentions are to no avail. The Second Circuit has held that attorney's fees may be used to satisfy the amount in controversy only where they are recoverable as of right pursuant to statute or contract. *See Givens v. W.T. Grant Co.,* 457 F.2d 612, 614 (2d Cir.1972), *vacated on other grounds,* 409 U.S. 56, 93 S.Ct.

---

**11.** It should be noted that, pursuant to the Case Management Order ("CMO") entered by this Court on Jan. 31, 2001, the plaintiff classes were defined so as to include individual consumers and third-party payors in the "Indirect Purchasers" class, and to include those entities not at the end of the chain-of-

distribution, for example, pharmacies and retailers, in the "Other Indirect Purchasers" class. It appears that the lawsuits addressed by this opinion were filed by what the CMO defines as "Indirect Purchasers," and not "Other Indirect Purchasers."

451, 34 L.Ed.2d 266 (1972); *see also ASI Sign Sys., Inc. v. Architectural Sys., Inc.,* No. 98 Civ. 4823, 1999 WL 553825, at *2 (S.D.N.Y. July 29, 1999); *Window Headquarters, Inc. v. MAI Basic Four, Inc.,* No. 91 Civ. 1816, 1994 WL 673519, at *11 (S.D.N.Y. Dec. 1, 1994); *San Juan Hotel Corp. v. Greenberg,* 502 F.Supp. 34, 35 (E.D.N.Y.1980).

Whether attorney's fees are awarded as of right is a matter of state, rather than federal law. The Tennessee Consumer Protection Act, which is the statutory basis for plaintiffs' causes of action in *Platt,* provides that attorney's fees are awarded to a successful litigant only at the court's discretion. *See* T.C.A. § 47–18–109(e)(1) (stating "[u]pon a finding by the court that a provision has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs.") Because plaintiffs in *Platt* would not necessarily be awarded attorney's fees as of right even if successful, the rule set forth in *Givens* disallows augmenting the amount in controversy for the purpose of determining whether there is diversity jurisdiction. Applying this rule, other courts within this Circuit have concluded that, in instances where an award of attorney's fees is not mandated by statute or contract, the fee award may not be considered in determining whether a plaintiff's claim exceeds the jurisdictional minimum. *See, e.g., Trapanotto v. Aetna Life Ins. Co.,* No. 95 Civ. 10704, 1996 WL 417519, at *9–10 (S.D.N.Y. July 25, 1996); *Colon v. Rent–A–Center, Inc.,* 13 F.Supp.2d 553, 561 (S.D.N.Y.1998); *Greenberg,* 1999 WL 587935, at * 4. For these reasons, defendants' request to consider attorney's fees in calculating the amount in controversy is rejected.

*Injunctive Relief*

 Lastly, defendants assert that plaintiffs' requests for injunctive relief in *Ozarow, Platt,* and *Sandhaus* satisfy the amounts in controversy because, under the laws of the states in which the complaints were filed, the value of the injunction must be determined from the defendants' viewpoint, rather than from the plaintiffs' point of view. However, defendants' argument fails because the question of whether to determine the value of injunctive relief from a plaintiff's or a defendant's perspective, being a matter relevant only to a determination of whether diversity jurisdiction is present, is a question of federal law.

 As noted above, the issue is determined by the law of this circuit. The Second Circuit has adopted the "plaintiff's view" test of injunctive relief; that is, the Second Circuit looks to the value of the property right plaintiffs seek to protect, rather than the loss that would be suffered by defendants by entry of an injunction. *See Kheel v. Port Auth. of New York,* 457 F.2d 46, 48–49 (2d Cir.1972); *McGowan,* 941 F.Supp. at 346–47 (S.D.N.Y.1996); *Rockwell v. SCM Corp.,* 496 F.Supp. 1123, 1125 (S.D.N.Y.1980); *but see In re Cardizem CD Antitrust Lit.,* 90 F.Supp.2d at 834–35 (adopting the "either viewpoint test"). Thus, the value of the injunction here would not be the future payments due under the Agreement to defendants or the profits lost by reduced sales of Cipro, but rather the amounts saved by plaintiffs by having the opportunity to purchase a generic version of ciprofloxacin. Defendants have not met their burden in showing that plaintiffs' claims for injunctive relief, assessed from the plaintiffs' viewpoints, satisfy the jurisdictional minimum. Because these claims may not be aggregated, defendants' argument must fail.

***Conclusion***

For the reasons stated above, plaintiffs' motions to remand in *Lee v. Bayer A.G.,* CV–00–4731 (CA); *Garber v. Bayer A.G.,*

CV–00–4529 (CA); *Patane v. Bayer A.G.,* CV–00–9099; *Samole v. Bayer Corp.,* CV–00–4530; *Ozarow v. Bayer Corp.,* CV–00–8922 (FL); *Platt v. Bayer Corp.,* CV–01–2155 (TX); *Relles v. Bayer Corp.,* CV–00–12453 (CA); *Sandhaus v. Bayer Corp.,* CV–00–2527 (KS); and *Meyers v. Bayer Corp.,* CV001–3924 (DGT) are granted except to the extent that this Court retains diversity jurisdiction over those large, institutional plaintiffs in *Ozarow* and *Sandhaus* whose claims exceed $75,000. Plaintiffs shall submit proposed orders reflecting these rulings within two weeks of the date of this Memorandum and Order.

**SO ORDERED.**