## In re TAMOXIFEN CITRATE ANTITRUST LITIGATION

### No. MDL 1408(ILG).

United States District Court, E.D. New York.

Aug. 26, 2002.

See, also, 196 F. Supp.2d 1371.

Joel M. Cohen, Davis Polk & Wardell, New York City, Bernard Persky, Barbara J. Hart, Hollis L. Salzman, Goodkind Labaton Rudoff & Sucharow LLP, New York City, for Tamoxifen Citrate Antitrust Litigation.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### SUMMARY

Plaintiffs Caroline Marks ("Marks"), Maxine Blonstein ("Blonstein"), and Lois Steward ("Steward"), on behalf of themselves and those similarly situated, represent classes of consumers and indirect purchasers of tamoxifen citrate ("tamoxifen") in California, Florida, and Kansas, respectively. Plaintiffs originally filed suits in state courts against defendants Zeneca, Inc., AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca PLC (collectively "Zeneca") and Barr Laboratories, Inc. ("Barr"), alleging state antitrust and consumer protection claims. Defendants subsequently removed the cases to federal court based on federal question and/or diversity jurisdiction.

Now before the Court are plaintiffs' two motions to remand, including the Marks and Blonstein plaintiffs' joint motion, *see Marks v. Barr Labs., Inc* (transferred from the Northern District of California) and *Blonstein v. Barr Labs., Inc.* (transferred from the Southern District of Florida), and the Steward plaintiffs' motion, *see Steward v. Barr Labs.* (transferred from the District of Kansas). Because there is substantial overlap of the arguments raised in the parties' briefs, the Court will consider the motions together.

### BACKGROUND [1]

These actions involve the drug tamoxifen, a critical drug for the treatment of breast cancer. In 1993, Zeneca acquired United States Patent 4,536,516 (the "'516 Patent") for tamoxifen from its predecessor, Imperial Chemical Industries, PLC ("ICI"). The '516 Patent will expire on August 20, 2002. Until that time, Zeneca owns the exclusive right in the United States to manufacture, sell, and license tamoxifen. Zeneca markets tamoxifen under the trade name Nolvadex.®

In December 1985, Barr filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA"), requesting approval to sell a generic bioequivalent version of the "pioneer" drug tamoxifen. An ANDA filing is governed by the Hatch–Waxman Act, 21 U.S.C. § 355, which provides an expedient method of obtaining FDA approval to bring generic bioequivalent drugs to the

---

1. The following background is taken from the three class action complaints, which include virtually identical factual allegations.

market. In addition to affirming that the generic drug contains the same active ingredient(s) as the patented drug already approved and listed by the FDA, an ANDA filer must certify, *inter alia*, that the patent of the pioneer drug is either invalid or would not be infringed by the generic bioequivalent version. *See* 21 U.S.C. § 355(j)(2)(A)(vii). Barr's ANDA application certified that the '516 Patent was invalid and unenforceable. Within forty-five days of receiving notice of Barr's ANDA application, ICI sued Barr for patent infringement in the Southern District of New York.[2] This lawsuit had the effect of staying FDA consideration and approval of Barr's ANDA application for thirty months or until the date of a final non-appealable determination as to the validity of the patent, whichever is earlier. *See* 21 U.S.C. § 355(j)(5)(B)(iii). The court, in its discretion, however, may extend the stay if the litigation is not resolved within the thirty month period. *Id.* One of the benefits of being the first ANDA filer to obtain FDA approval is an exclusive 180–day period in which to sell the generic drug free from other generic drug competition. *See* 21 U.S.C. § 355(j)(5)(B)(iv). The 180–day period of market exclusivity begins when the applicant first sells its product or when a final non-appealable judicial determination is entered as to the patent's invalidity, whichever is earlier.[3] *Id.*

ICI's patent infringement suit against Barr was tried before the late Judge Vincent L. Broderick. On April 20, 1992, Judge Broderick held that the '516 Patent was invalid and unenforceable, because ICI wrongfully withheld relevant material from the United States Patent and Trademark Office. *Imperial Chem. Indus., PLC v. Barr Labs., Inc.*, 795 F.Supp. 619 (S.D.N.Y.1992). ICI appealed that determination to the Federal Circuit. However, in 1993, while the appeal was pending, ICI/Zeneca and Barr entered into a settlement agreement (the "Settlement Agreement"), whereby Barr agreed to drop its challenge to the validity of the '516 Patent and to amend its ANDA application to certify that it would not seek to market its generic version of tamoxifen until the patent expired, Zeneca agreed to pay Barr $21 million and to give Barr a license to sell Zeneca's tamoxifen under a generic label.

The Settlement Agreement was to become effective only upon entry of an order by the Federal Circuit directing the district court to vacate its finding of patent invalidity. Barr and Zeneca filed a Joint Motion to Dismiss the Appeal as Moot and to Vacate the Judgment Below. On March 19, 1993, the Federal Circuit granted the motion to dismiss and vacated the judgment below, pursuant to its practice at the time to honor settlement agreements. *See*

**2.** Zeneca's patent infringement lawsuit also named as a defendant Heumann Pharma GmbH & Company ("Heumann"), Barr's supplier of tamoxifen. While the lawsuit was pending, Heumann was dismissed, in accordance with the terms of a stipulation of settlement. As part of that settlement agreement, Zeneca promised to pay Heumann a sum of cash over a ten year period in exchange for Heumann's promise to discharge all claims related to the '516 Patent.

**3.** In light of two recent district court decisions, *TorPharm v. Shalala*, No. 97–1925, 1997 U.S. Dist. LEXIS 21983 (D.D.C. Sept.

15, 1997), appeal withdrawn and remanded, 1998 WL 135491, 1998 U.S.App. LEXIS 4681 (D.C.Cir. Feb. 5, 1998), vacated Apr. 9, 1998; *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F.Supp.2d 30 (D.D.C.2000), the FDA has amended its regulation defining "court action" in the context of the timing of ANDA approvals and the commencement of the 180–day exclusivity period so that a district court determination of patent invalidity is now considered to be a final decision. *See* 21 C.F.R. § 314.107(e); Rules and Regulations, Dep't of Health and Human Serv., 65 Fed.Reg. 43233 (July 13, 2000) (interim rule; opportunity for public comment).

*Imperial Chem. Indus., PLC v. Heumann Pharma GmbH & Co.*, 991 F.2d 811 (Fed. Cir. Mar.19, 1993) (unpublished).[4] On March 23, 1993, Judge Broderick vacated the judgment and entered a Stipulation of Dismissal and Order. Consequently, the '516 Patent remains valid, and Zeneca's Nolvadex and Barr's generic are the only tamoxifen currently on the market.

The Settlement Agreement has spawned thirty lawsuits around the country, all of which have been transferred to this Court, pursuant to 28 U.S.C. § 1407, by the Judicial Panel on Multi–District Litigation, for coordination of pre-trial matters. The complaints allege that the Settlement Agreement has enabled Zeneca and Barr to (i) revive a patent that Barr had established was invalid and unenforceable; (ii) allocate the entire United States market for tamoxifen to one manufacturer: Zeneca; (iii) share the monopoly profits of Zeneca's tamoxifen; (iv) avoid price competition and maintain artificially inflated market prices for Nolvadex® and its Zeneca-manufactured generic; and (v) exclude competition from other generic manufacturers. (*See* Blonstein Compl. ¶ 57; Marks Compl. ¶ 79; Steward Compl. ¶ 57.) The complaints also allege that the FDA would have been permitted to grant final approval to Barr's generic version of tamoxifen if the appeal of the patent suit against Barr had run its course and had resulted in an affirmance of Judge Broderick's finding of invalidity. (*See* Blonstein Compl. ¶ 60; Marks Compl. ¶ 82; Steward Compl. ¶ 58.)

As noted above, these actions were filed in state courts, and were then removed by defendants to federal courts. Plaintiffs now seek to remand the actions, arguing that the federal courts lack subject matter jurisdiction. The Steward plaintiffs argue, in the alternative, that removal was improper based on a procedural defect in the notice of removal. In support of removal, defendants argue that federal question jurisdiction exists, pursuant to 28 U.S.C. § 1331, under (1) federal patent law; (2) the Noerr–Pennington Doctrine; and (3) the theory that plaintiffs are collaterally attacking federal court orders. With respect to the Marks class action only, defendants also argue that diversity jurisdiction exists under 28 U.S.C. § 1332.

## DISCUSSION

In a multidistrict litigation, such as this one, the law of the circuit where the transferee court sits governs in deciding questions of federal law. *See Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993). Thus, the Court will apply the law of this Circuit in deciding the motions.

### I. *Legal Standard for Remand*

A state court action may be removed to federal court "if it qualifies as a 'civil action . . . of which the district courts of the United States have original jurisdiction . . . .' " *Rivet v. Regions Bank of La.*, 522 U.S. 470, 474, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) (quoting 28 U.S.C. § 1441(a)). However, the Court is required to remand "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c); *Manway Constr. Co. v. Hous.*

---

**4.** Since that time, the Supreme Court has ruled that federal appellate courts may not direct the *vacatur* of district court orders based solely on a settlement agreement between the parties. *See United States Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 27, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). However, *United States Bancorp* has been given retroactive effect only to cases which were pending when *United States Bancorp* was decided. *See Zeneca Ltd. v. Novopharm Ltd.*, 111 F.3d 144, 1997 WL 168318, at *2 (Fed.Cir. Apr.10, 1997). Because Judge Broderick's *vacatur* order was issued prior to that decision, it is not subject to further review.

*Auth. of Hartford,* 711 F.2d 501, 503 (2d Cir.1983). "[F]ederal courts construe the removal statute narrowly, resolving any doubts against removability." *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1045–46 (2d Cir.1991) (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108, 61 S.Ct. 868, 85 L.Ed. 1214 (1941)). Thus, the party requesting removal carries a heavy burden to demonstrate that the removal was proper. *See United Food & Commercial Workers Union, Local 919, AFL–CIO v. CenterMark Props. Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir. 1994).

## II. The Actions "Arise Under" Federal Patent Law

■ A federal court has original jurisdiction of all civil actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Under long-standing Supreme Court precedents, the analysis of whether a claim "arises under" federal law is determined by the " 'well-pleaded complaint rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.' " *Rivet,* 522 U.S. at 475, 118 S.Ct. 921 (quoting *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)). An "independent corollary" to the well-pleaded complaint rule, *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 22, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), "is the further principle that 'a plaintiff may not defeat removal by omitting to plead necessary federal questions.' " *Rivet,* 522 U.S. at 475, 118 S.Ct. 921 (quoting *Franchise Tax Bd. of Cal.,* 463 U.S. at 22, 103 S.Ct. 2841). "If a court concludes that a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint." *Id.* Moreover, "[a] defense is

not part of a plaintiff's properly pleaded statement of his or her claim," and therefore cannot support removal jurisdiction, "even if [it] is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Id.* (internal quotation marks and citations omitted). Similarly, answers and counterclaims cannot serve as the basis for "arising under" jurisdiction. *See Holmes Group v. Vornado Air Circulation,* —— U.S. ——, 122 S.Ct. 1889, 1894, 153 L.Ed.2d 13 (2002).

District courts have original jurisdiction over claims relating to patents. *See* 28 U.S.C. § 1338(a). In *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), the Supreme Court established a two-part test to decide which cases "arise under" Section 1338:

> [J]urisdiction ... extend[s] only to those cases in which a well-pleaded complaint establishes either [1] that federal patent law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.

*Id.* at 808–09. The Court made clear that to be a "necessary element" of one of the well-pleaded claims, the patent law question must be essential to every theory upon which the claim relies. *Id.* at 810, 108 S.Ct. 2166. Thus, a claim supported by alternative theories which do not rely on the resolution of a question of patent law will not form the basis for Section 1338(a) jurisdiction. *Id.*

Defendants concede that federal patent law does not create plaintiffs' causes of action, and, therefore, the first prong of *Christianson* is not implicated. Instead, defendants argue that plaintiffs' claims necessarily require resolution of a substan-

tial question of federal patent law. They argue that Zeneca, as a patent holder, can exclude generic competition and legitimately license Barr to market Zeneca-supplied tamoxifen. Thus, to show that the Settlement Agreement was an illegal restraint on trade, plaintiffs must prove that the '516 Patent was invalid or unenforceable. Plaintiffs argue that they do not seek to litigate the validity of the patent, and that any mention of patent law is merely tangential to their claims.

The majority of district courts to consider the question in similar contexts have ruled in favor of remand. *See, e.g., Ciprofloxacin Hydrochloride Antitrust Litig. ("Cipro")*, 166 F.Supp.2d 740 (E.D.N.Y. 2001); *McGrew v. Schering–Plough Corp.*, No. 01–2311–GTV, 2001 WL 950790 (D.Kan. Aug.6, 2001); *Altman v. Bayer Corp.*, 125 F.Supp.2d 666 (S.D.N.Y.2000); *Drug Mart Pharmacy Corp. v. Abbot Labs.*, No. 00–631–CV, slip op. (E.D.N.Y. Aug. 28, 2000); *In re Cardizem CD Antitrust Litig.*, 90 F.Supp.2d 819 (E.D.Mich. 1999) ("*Cardizem*"); *Aetna United States Healthcare v. Hoechst Aktiengesellschaft*, 54 F.Supp.2d 1042 (D.Kan.1999). However, only one district court has considered the question in this case, and concluded that plaintiffs' California antitrust claims raised a substantial question of federal patent law. *Koonan v. Barr Labs.*, No. C–01–0779, slip op. at 8 (N.D. Cal. June 21, 2001). Undeniably, this case presents a difficult issue of federal question jurisdiction under the second prong of *Christianson*. The Court is driven to conclude, however, that it must decline to follow the majority of cases that rule in favor of remand, as it believes that the plaintiffs cannot succeed on their claims without proving the invalidity or unenforceability of Zeneca's patent. The cases must therefore remain in federal court, and the plaintiffs' motions to remand must be denied.

The holder of a lawfully obtained patent maintains a monopoly over his product and may "prevent other[s] from utilizing his discovery without his consent." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir.1981) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)). A patent holder also "may assign to another his patent, in whole or in part, and may license others to practice his invention." *Id.* (quoting *Zenith Radio Corp.*, 395 U.S. at 135, 89 S.Ct. 1562). "Simply stated, a patent holder is permitted to maintain his patent monopoly through conduct permissible under the patent laws." *Id.* In light of these basic principles, plaintiffs must prove that Zeneca's conduct (*i.e.* entering into the Settlement Agreement) was impermissible under the patent laws.

Plaintiffs argue that the Settlement Agreement was anti-competitive, because Zeneca paid Barr to stay out of the market until the expiration of Zeneca's patent. Plaintiffs assume that Barr would have begun producing its own generic version of Novladex® when Barr proved successful on appeal at the Federal Circuit, and that the Settlement Agreement effectively eliminated that outcome. At oral argument, the Court questioned whether it was possible that Barr settled to avoid the risk that Judge Broderick's determination of patent invalidity would be overturned on appeal, and that Zeneca settled to avoid the risk that the decision would be affirmed. Although counsel ultimately conceded that it was possible, he persisted that the Settlement Agreement was anti-competitive based on the amount of money Zeneca paid to Barr. Without passing on the merits of plaintiffs' claims, the Court is compelled to note that the Federal Circuit has since reviewed a similar challenge to the '516 Patent based on inequitable conduct, the precise basis upon which Judge Broderick found the '516 Patent to be in-

valid, and concluded that the '516 Patent was still valid. *Zeneca Ltd.*, 1997 WL 168318, at *4. Moreover, in a recent decision by the Federal Trade Commission involving a similar agreement, an administrate law judge ruled that there was no way to determine the outcome of a patent infringement lawsuit, in light of expert testimony that the Federal Circuit had a fifty percent reversal rate of intellectual property appeals. *In the Matter of Schering–Plough Corp.*, No. 9297, 2002 WL 1488085, ¶¶ 393–94 (FTC June 27, 2002). Thus, it is certainly plausible that the Settlement Agreement was entered into by Barr to avoid an unfavorable outcome on appeal.[5]

While the owner of a valid patent does not have carte blanche to engage in any conduct it wishes and cannot assume that its patent will always immunize it from antitrust liability, this is not a situation, for example, where defendants are alleged to have engaged in sham patent infringement litigation for the purpose of delaying generic drug competition. Proof of sham litigation would certainly seem to be outside the scope of protected activity under a valid patent.

The specific references in the complaints to the enforceability of the '516 Patent preclude avoiding the conclusion that the validity of the patent is the *sine qua non* of the Settlement Agreement which, in turn, goes to the heart of the plaintiffs' grievance. For example, the complaints set out a portion of the Distribution and Supply Agreement which was executed simultaneously with the Settlement Agreement as follows:

> (2) In the event that the '516 Patent is held invalid and/or unenforceable in a final, unappealable judgment, Barr may terminate this Agreement immediately, provided, however, that Barr shall pay ZENECA for the inventory of the Product which ZENECA, or its designee, has manufactured or has in the manufacturing process . . . .

Distribution and Supply Agreement ¶ 24(b).

(Blonstein Compl. ¶ 41; Marks Compl. ¶ 64; Steward Compl. ¶ 43.) In addition, the plaintiffs allege that the Settlement Agreement enabled Zeneca and Barr "to revive a patent that Barr had established was invalid and unenforceable." (Blonstein Compl. ¶ 57; Marks Compl. ¶ 79; Steward Compl. ¶ 57.) They also allege that Barr would have marketed its own generic drug prior to the expiration of Zeneca's patent, assuming that the invalidity of the patent would have been affirmed on appeal. For example, two of the complaints state: "If the appeal of the patent suit against Barr had run its course and resulted in an affirmance of Judge Broderick's finding of invalidity, Zeneca's patent would have been removed from the FDA Orange Book and any applicable 180–day exclusivity period would have begun to run." (Blonstein Compl. ¶ 60; Marks Compl. ¶ 82.) The third complaint includes similar language: "If Barr had prevailed [on appeal], the FDA would have

---

**5.** At oral argument, the Marks and Blonstein plaintiffs presented the alternative theory that, under the Hatch–Waxman Act, Barr could have begun producing its generic drug after thirty months, even if Zeneca's appeal was still pending at the Federal Circuit. However, plaintiffs do not allege, nor does Barr concede, that it would have begun marketing its product during the pendency of Zeneca's appeal and risk having to pay hefty penalties for infringing Zeneca's patent. *See*

*In the Matter of Schering–Plough*, 2002 WL 1488085, ¶¶ 390–92 (expert testimony revealed unlikelihood that generic manufacturers would bring their product to market during the pendency of an appeal of a patent infringement suit based on the "very severe penalties" for patent infringement); *see also Cipro*, 166 F.Supp.2d at 744 (noting the risk of producing a generic drug prior to the Federal Circuit's ruling on the patent infringement suit).

been permitted to grant final approval to Barr's generic version of tamoxifen, allowing Barr to offer generic competition to Zeneca."[6] (Steward Compl. ¶ 58.) To prove these allegations, which appear on the face of plaintiffs' complaints, it appears beyond doubt that a court will have to determine the validity, enforceability or scope of Zeneca's patent.

The policy behind *Christianson* is that the patent law is intended to be applied uniformly by the Federal Courts. If state courts were able to make rulings on any anti-competitive theory that could nullify patent rights, uniformity of the patent law would be a mirage. Thus, the Court concludes that plaintiffs' claims necessarily depend upon the resolution of a substantial question of federal patent law.

On a final note, the Court finds that *Cipro, supra,* a case upon which plaintiffs most heavily rely, is distinguishable. *Cipro* involved a similar settlement agreement, in which Barr agreed to discontinue its challenge to Bayer's patent in exchange for monetary compensation. However, the *Cipro* plaintiffs alleged that they could prevail, regardless of the patent's invalidity, by demonstrating that Bayer would have granted a license or otherwise authorized Barr to distribute Cipro had Bayer and Barr not entered into the agreement. *Cipro,* 166 F.Supp.2d at 749. Based on the theory that the settlement agreement forestalled any possibility of a lawful licensing agreement, the court held that plaintiffs could succeed on their claims without proving the invalidity of Bayer's patent. *Id.* at 749–50. The cases were therefore remanded to state court. Plaintiffs here do not allege, nor could they allege, this alternative theory, for the reason that the Zeneca/Barr Agreement in-

cluded the type of licensing arrangement contemplated in *Cipro.*

For all of these reasons, the Court finds that these actions "arise under" federal patent law, and, accordingly, that the motions for remand must be denied.

### III. *The Removal Procedure in the Steward Action Was Proper*

■ The Steward plaintiffs also challenge the removal of the action as procedurally defective. Because plaintiffs timely raised their objection within thirty days after the notice of removal was filed, the issue is properly before the Court. *See* 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal . . . ."). Plaintiffs argue that the removal was procedurally defective, because defendant AstraZeneca PLC, a foreign company located in London, England, failed to join in the Notice of Removal within thirty days from the date of service on the first defendant. This timing requirement is known as the "first-served rule," and has been adopted by a majority of courts, including the District of Kansas. *See, e.g., Henderson v. Holmes,* 920 F.Supp. 1184, 1188 n. 3 (D.Kan.1996); *see also Getty Oil v. Ins. Co. of N. Am.,* 841 F.2d 1254, 1262–63 (5th Cir.1988). However, despite counsel's suggestion at oral argument that the law of Kansas applies in this instance, the Court, acting pursuant to the authority of 28 U.S.C. § 1407, is bound only by Second Circuit precedent. *See Menowitz,* 991 F.2d at 40; *cf. Lou Levy & Sons Fashions, Inc.,* 988 F.2d 311, 312 (2d Cir.1993) (noting that in multidistrict litigation transfers of diversi-

---

**6.** It should again be noted that the Federal Circuit recently decided that the '516 Patent was still valid, thus providing a reasonable and justifiable basis for the Settlement Agreement. *See Zeneca Ltd.,* 1997 WL 168318, at *4.

ty actions, the *substantive* state law of the transferor court applies).

Pursuant to 28 U.S.C. § 1446(b), "the notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant . . . ." In a multi-defendant case, such as this one, "timely consent of each defendant is required as a precondition for removal." *Tate v. Mercedes–Benz USA, Inc.*, 151 F.Supp.2d 222, 223 (N.D.N.Y.2001) (citing *Chi., Rock Island & Pac. Ry. Co. v. Martin*, 178 U.S. 245, 249, 20 S.Ct. 854, 44 L.Ed. 1055 (1900)). While a defendants' signature on the removal petition itself is not required, *see Town of Moreau v. State Dep't of Envtl. Conservation*, No. 96–CV–983, 1997 WL 243258, at *6 (N.D.N.Y. May 5, 1997), each defendant must submit some form of "unambiguous written evidence of consent," *id* at *4; *Henderson*, 920 F.Supp. at 1187 ("Each party must independently and unambiguously file notice of its consent and its intent to join in the removal within the thirty day period.").

As noted above, the majority of courts apply the "first-served rule." A minority of courts apply the "last-served rule" or the "later-served rule," which restarts the thirty-day clock each time a defendant is served. *See, e.g., Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527 (6th Cir.1999). Another group of courts apply an intermediate rule, sometimes referred to as the "McKinney Rule" derived from *McKinney v. Board of Trustees of Mayland Community College*, 955 F.2d 924, 928 (4th Cir.1992), which requires the first-

served defendant to file a removal petition within thirty days, and the thirty-day clock then restarts each time a new defendant is served.

Neither the Second Circuit nor the Supreme Court has weighed in on the question of which rule of timing should apply. In considering a different question, the Supreme Court held that Section 1446(b)'s time for removal does not begin to run until the defendant has been officially served with a summons and the complaint. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999). The Court reasoned that "one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority asserting measure stating the time with which the party served must appear and defend." *Id.* at 350, 119 S.Ct. 1322. In *Varela v. Flintlock Const., Inc.*, 148 F.Supp.2d 297 (S.D.N.Y. 2001), the court held that the "last-served rule" is more consistent with *Murphy Brothers*, because "it preserves every defendant's opportunity to seek removal and provides every defendant with a uniform time in which to do so, where under the first served defendant rule, the procedural rights of later served defendants [may] slip away before one is subject to any court's authority." *Id.* at 300 (quotation marks and citation omitted).[7] Other district courts in this Circuit have rejected the "first-served rule" for similar reasons. *See, e.g., Tate*, 151 F.Supp.2d at 224–25 (rejecting "first-served rule" in favor of

---

7. Courts in other circuits have taken different approaches with respect to the "first-served rule" since *Murphy Brothers*. *Compare, Griffith v. Am. Home Prods. Corp.*, 85 F.Supp.2d 995, 1000 (E.D.Wash.2000) (in adopting McKinney Rule, court stated "*Murphy Brothers* casts doubt on the continuing validity of the first-served defendant rule to the extent that that case stands for the proposition that the removal statute should not be so strictly

construed as to deny defendants significant procedural rights before becoming parties to an action"), *with Prescott v. Mem'l Med. Ct.-Livingston*, No. 00–CV–0025, 2000 WL 532035, at *5 (E.D.Tex. Mar. 25, 2000) (declining to overrule well-established Fifth Circuit precedent applying "first-served rule" under *Murphy Brothers*, because *Murphy Brothers* never mentioned or considered it).

"McKinney Rule" because it enables plaintiffs to use "dilatory tactics to overcome the legitimate removal rights of defendants"); *Russell v. LJA Trucking Inc.*, No. 00–CV–7629, 2001 WL 527411, at * 1–2 (E.D.N.Y. May 11, 2001) (rejecting "first-served rule" in favor of "later-served rule," holding, *inter alia*, that it supports a more natural reading of Section 1446(b) and plaintiffs will not be unduly prejudiced by its application).

The Court concludes that application of the "first-served rule" would not be fair to the defendants, nor does it seem appropriate in light of *Murphy Brothers* and the language of Section 1446(b). Because AstraZeneca PLC filed its Consent to Removal within thirty days after it was served, the Court finds that it timely joined in the removal of this action.

## CONCLUSION

For the foregoing reasons, the motions to remand are denied.

SO ORDERED.